# ORIGINAL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PHENIDE JOSEPH,
GEORGE JOSEPH,

Plaintiff,

-against-

OCWEN FINANCIAL CORPORATION,
OCWEN LOAN SERVICING, LLC,
& JOHN DOE #1 through JOHN
DOE #10, representing any and
all owners, trustees, officers,
affiliates, individuals, supervising
agencies, and corporations, having
or claiming an interest in this present
controversy,

Defendants.

DeARCY HALL, J.   **CV 18 - 4971**

BLOOM, M.J.

**COMPLAINT**
Case No.:
JURY DEMAND
**Jurisdiction &**
**Venue is proper**
**based on where**
**the cause(s) for**
**this controversy**
**originated**



RECEIVED
AUG 3 1 2018
PRO SE OFFICE

---

## FACTS/PROCEFURAL HISTORY

PHENIDE JOSEPH and GEORGE JOSEPH respectfully allege upon information and belief as

follows:

1- That Ocwen Loan Servicing, LLC is a limited liability company, a wholly owned subsidiary
   servicing company of Ocwen Financial Corporation. Its primary place of business is in Palm
   Beach, Florida. And that Ocwen Loan Servicing, LLC is one of the largest mortgage servicers in
   the United States.

2- That Ocwen Loan Servicing, LLC specializes in servicing loans of distressed borrowers. And that
   prior to June 29, 2005, Ocwen Loan Servicing, LLC operated as a savings bank under the
   assumed name of Ocwen Federal Bank, FSB, which offered residential special loan services and
   residential subprime loan services from 1938 until it went out of business  on June 29, 2005;
   except that prior to October of 1996, Ocwen Federal Bank, FSB was known as Berkeley Federal
   Bank &Trust, F.S.B.

3- And that on June 29, 2005, "Ocwen", collectively, hereafter the "Defendant(s)" reorganized
   itself  to only service distress loans, Ocwen Federal Bank, FSB sold its New Jersey Office to

Marathon National Bank of New York. The Defendant, Ocwen Federal Bank, FSB also sold its assets to Ocwen Loan Servicing, LLC, a Delaware Limited Liability Company. And that based upon information and belief, Ocwen Loan Servicing, LLC exists under and by the virtues of the Laws of the United States. It exists under and by the virtues of the rules and the regulations promulgated by the Consumer Financial Protection Bureau (CFPB), which regulates the Defendant(s); the Defendant(s) is also regulated by the Office of Thrift (OTS) in accordance with U.S. 12 CFR Section 546.4.

4- And that based upon information and belief, the Defendant(s) have been named as a party defendant in several lawsuits similar to that being alleged by the Plaintiffs. CFPB also has received literally thousands of complaints throughout the several states that are similar to that being alleged by the Plaintiffs through its database. In fact, in 2014, the Consumer Financial Protection Bureau, (CFPB) in conjunction with several states Attorneys Generals, sued the Defendant(s) for committing numerous violations of Federal consumer financial laws that have harmed borrowers and have successfully obtained large sums of money judgment against the Defendant(s). The Defendant(s) was forced to pay a hefty fine due to such violations to compensate those victims.

5- And that once again, in 2017, the Consumer Financial Protection Bureau, upon its own initiative, successfully proved its case against "Ocwen", collectively. Some of the allegations that were alleged in both suits were as follows:

   (a) that it had improperly calculated borrowers' loan balances;'

   (b) that it failed to properly investigate and make corrections in response to consumer complaints;

   (c) that it illegally foreclosed on borrowers' loans and sold loan servicing rights to servicers without fully disclosing or correcting errors in borrowers' loan files.

6- Now under the Federal consumer financial laws, the services that Ocwen Loan Servicing, LLC renders is defined as a "servicer". According to such a law, a servicer is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from mortgagors, applying payments made in an agreed upon order to the mortgagor's indebtedness, distributing payments after allowable deductions to the investments trust entities for distribution to investors, making advances to cover delinquent mortgage payments and other costs, such as the costs for protecting and maintaining properties that collateralize mortgage loans when mortgagors fail to do so, pursuing collections from delinquent

mortgagors, pursuing either loss mitigation or foreclosure, as appropriate to minimize the loss to investors and others when mortgagors become delinquent on mortgage payments.

7- And that Plaintiffs' complaint against Ocwen Loan Servicing, LLC, and Ocwen Financial Corporation are so similar to the complaints that were filed by the Consumer Financial Protection Bureau (CFPB) and by the several states Attorney Generals that if it were possible, since the Defendant(s) are also regulated by the CFPB, and since the reliefs that the Plaintiffs are requesting is also similar to the reliefs that the CFPB and by the several states Attorneys Generals have also requested, it may be in the best interest of the Court if It allowed the CFPB to also be a third-party plaintiff in this action. And that on May 29, 1997 Citicorp Mortgage, Inc. on behalf of Citibank, N.A., a National Banking Association, the original owner of Plaintiffs' Note and Mortgage, which was executed on October 12, 1989, assigned the Mortgage to Ocwen Federal Bank, FSB. And that even though the Assignment also intended to transfer both the Note and Mortgage to Ocwen Federal Bank, FSB, no Note had been filed on record in connection with Citibank, N.A's assignment to Ocwen Federal Bank, FSB. See Plaintiffs' original Note & Mortgage, together with the Assignment of Note and Mortgage as **Exhibits "1"**.

8- And that prior to such an assignment, there was a controversy between Citibank, N.A. and the Plaintiffs; and the Supreme Court, of the State of New York, within the County of Queens, did resolve this dispute. Citibank, N.A. claimed that the Plaintiffs owed $177, 716.08 dollars from April 1, 1993 to January 31, 1996; but the Plaintiffs believed that they owed less than what Citibank, N.A. claimed to be due. The Plaintiffs believed that it was the sum of $162, 696.31 dollars that was due. And that the appointed referee, Stehpan J. Siegel, determined, within its final report, that it was the sum of $165, 243.55 dollars that was actually due and owing; and that Citibank, N.A. failed to credit the Plaintiffs' mortgage account of as much as $12, 472.53 dollars. See the Referee's Report as **Exhibits "2"**.

9- And that from the date of acquisition by Ocwen Federal Bank, FSB, on May 29, 1997, the principal amount, as the referee clearly pointed out in its report, was $129, 687.75 dollars. And that the total amount in arrears, in addition to the $129, 687.75 dollars in principal, which includes past due payments, late charges, interest, escrow account, appraisal, and inspection fees was $177, 716.08 dollars minus the $12, 472.53 dollars which the Plaintiffs were entitled to. See **Exhibit "3"**. The Court's final Order, adhering to the Referee's report dated April 18, 1996.

10- And that approximately one (1) year after the Referee completed its report, on May 29, 1997, Citibank, N.A. finally decided to assign the Mortgage to Ocwen Federal Bank, FSB. And on August 29, 1997, Plaintiff, Phenide Joseph, in an effort to resolve this long, drown out controversy, executed the Modification Agreement that had been prepared by Ocwen Federal Bank, FSB. See **Exhibits "4"**. The Modification Agreement. However, as of January 2013 Plaintiff Phenide Joseph was no longer the owner of the premises in question. And that the Plaintiff George Joseph became the owner as of January 2013.

11- The August 1997 Modification Agreement erroneously claims that the Plaintiffs owe $201, 344.00 dollars to the Defendant(s). Such an amount is incorrect, since the monthly installment payment prior to and after the controversy was $1,376.56 dollars, which included Plaintiffs' payment for principal, interest, and escrow. And that approximately seventeen (17) months had elapsed since the referee made his report to the date that the Modification Agreement became in effect. Seventeen (17) months X $1, 376.56 dollars is equal to $23, 401.52. The referee had already determined that it was the sum of $35, 555.80 dollars that was in arrears from April 1, 1993 to January 31, 1996, which includes the $12, 472.53 dollars credit that Citibank, N.A. failed to provide to the Plaintiffs. And that because it took approximately 17 months from the time that the report was made to the time that the modification agreement was became in effect, the sum of $23, 401.52 dollars is added to the $35, 555.80 dollars. So that the sum of $58, 957.32 was the actual amount in arrears on August of 1997 when the Defendant(s) obtained its assignment from Citibank, N.A..

12- And that in an effort to reduce the amount in arrears, on or about August of 1997, Plaintiffs wired $50, 000.00 dollars to Ocwen Federal Bank, FSB, which should have reduced the entire amount in arrears to $8, 957.32 dollars. Clearly, if the Plaintiffs paid the $58, 957. 32 dollars instead of the $50, 000.00 dollars, their mortgage would have been reinstated and be up-to-date. But that unfortunately, the Defendant(s) prepared this Modification Agreement with an erroneous amount claimed to be due and owing, with no indication as to the actual amount in arrears. The Defendant(s) could have or should have offered alternative options to cure the $8, 957.32 dollars that was in arrears but failed to do so.

13- The Modification Agreement did not specifically explain how the $50, 000.00 dollars was applied. And that based on one of the Defendant(s) correspondence dated November 10, 2017,

such an amount was inappropriately applied; in that Ocwen Loan Servicing, LLC claimed to have applied or capitalized $2, 582.42 dollars to pay for escrow account and for unspecified fees. Ocwen Loan Servicing, LLC, within its November 10, 2017-Letter also claimed to have made 33 .payments in the amount of $1, 494.00 dollars to satisfy the December 1, 1994 through August 1, 1997 payments. Now where did this Defendant(s) get these dates from? It's totally inconsistent with the Referee's report and with the facts in this case. Could such an inaccurate information be due to the Defendant'(s)' long standing reputation of inputing inaccurate and incomplete loan information into its REALServicing system of record as set forth within the CFPB's September 2017 Complaint it?

14- The Defendant(s) knew or should have known that it had always been the sum of $1, 376.56 dollars, which included the $127.00 dollars for escrow payment. See previously submitted Exhibits "4". And that by making those 33 payments in the amount of $1, 494.00 and also capitalizing the sum of $2,582.42 dollars to pay for insurance and taxes, the Defendant(s) further botched up the Plaintiffs' mortgage. See **Exhibits "5"**. A copy of the Defendant'(s)' November 10, 2017-Letter.

15- Interestingly enough, the Defendant(s), within that November 10, 2017-Letter before mentioned above, through its officer from the Office of the Consumer Ombudsman, seems to adhere to or recites the same information or computation from the referee's report. However, Phetsamy Khamdaranikorn or the Defendant(s) fail to or deliberately choose not to apply the Referee's findings and computations  to our mortgage See previously submitted **Exhibits "5" page 1.**

16- Plaintiffs continued to send several letter to the Defendant(s), at least a dozen over the past few years, in an effort to ascertain the actual amount in arrears and to have their mortgage reinstated, but the Defendant(s) continued to ignore the question or chose not to respond to the specific questions in connection with how much is in arrears on the mortgage", which will soon reach its maturity date on November 1, 2019. It was not until after the Plaintiffs re-examined their mortgage file that they have uncovered the Defendant(s) fraudulent scheme. On or about April 19, 2005, Ocwen Federal Bank, FSB prepared a Forbearance Agreement with the Plaintiffs.

17- Within such a Forbearance Agreement, Ocwen Federal Bank, FSB claims that the Plaintiffs have executed a promissory note in the amount of $129, 688.00 on August 1, 1997, etc. The document further stated in paragraph "C" as follows, "Borrower has defaulted on the Note and the Mortgage (Referring to the Modification Agreement on August 1, 1997) as of 4/18/2005; the amount due under the terms of the Note is $76, 322.43 ("Default") and the current contractual due date is 6/1/2001. Plaintiffs, based on their recollections, do remember that there was a forbearance agreement made between Ocwen Federal Bank, FSB and them. And that such a forbearance agreement was completely paid off. And that on or about February 3, 2017, the Plaintiffs received a credit of about $900.00 dollars as they overpaid the Defendant(s).

18- During that month, on or about February 3, 2017, Plaintiffs only paid $434.92 dollars for mortgage. Plaintiffs have been successfully paying the Defendant(s) an extra $130.00 dollars per month for 11 years within their monthly mortgage payments. See **Exhibits "6"**.  It's the Ocwen Federal Bank, FSB's Forbearance Agreement. So that during that time, beginning in 2005, Plaintiffs' monthly payment was an even $1500.00 dollars and went back to the usual amount on or about March of 2016 when the Plaintiffs were taken off the Forbearance Plan.

19- In essence, according to Ocwen Federal Bank, FSB's and Ocwen Loan Servicing, LLC's, the Defendant(s) believe that they provided a new loan to the Plaintiffs. On that day, the Defendant(s) represented itself as an entity with the power to provide a loan, or would like the Plaintiffs to believe, under false pretense, that the August 1997-Modification Agreement was an actual note and mortgage that was signed. And that despite additional efforts that the Plaintiffs have made in an effort to correct these errors, each response from the Defendant(s) further confused and enraged these Plaintiffs. No wonder the Defendant(s) refuses to or is reluctant to correct this error. The Defendant(s) somehow convinced itself that the Plaintiffs are responsible to pay them for an additional 7 or 8 years without any just cause and without validating what's actually due and owing.

20- And although Ocwen Federal Bank, FSB might not have to or be exempt from filing an assignment of mortgage and note on behalf of Ocwen Loan Servicing, LLC, the Plaintiffs did not receive any correspondence from Ocwen Loan Servicing, LLC informing them, at least in detail, of the nature of the transfer, the amount to be collected, the date and time in which the Defendants would cease from collecting any payments, its effect on the Plaintiffs' current

mortgage, if any, etc. The August 1997-Modification Agreement, in addition to its failure of not specifically stating the amount that was in arrears, obviously also failed to recast any amount that is alleged to be in arrears over the lifetime of the mortgage or over the remaining years of the mortgage in accordance with applicable Federal or State rules or guidelines. And had Ocwen Federal Bank, FSB accurately, timely and appropriately transferred the right information relating to the Plaintiffs' loan, the Plaintiffs would not have to commence this legal action against the Defendant(s).

21- And since the Plaintiffs did not get anywhere with the Defendant'(s)' responses, on or about April 12, 2018 the Plaintiffs sent a letter to the Defendant(s) informing them as follows: (1) Notice of Several Errors in Loan Modification; (2) Notice of amount due on original note and mortgage; (3) Notice of error within the assignment(s) & transfer(s) of the note and mortgage; and (4) Notice of Request to Disclose Documents and to Validate the Debt; (5) Notice of Debt Dispute or Disputed Debt as to the Amount Due and Owing in Loan Modification. See **Exhibits "7"**. It is a copy of Plaintiffs' April 12, 2018-Letter, together with its exhibits.

22- And that as a response to Plaintiffs' letter dated April 12, 2018, the Defendant(s) responded by stating the following: (1) We do not have copies of the notice of servicing transfer. (2) We are unable to respond to concerns regarding occurrences prior to our acquisition of servicing of the account in 1997. (3) There is no single owner of the account, but rather the account is one of many in a securitized investment trust, Mortgage Pass-Through Certificates 1998-R2. We are servicing the account for this trust. U.S. Bank National Association is the Trustee.  However, as previously stated, they <u>do not</u> own the account, etc."

23- First and foremost, Plaintiffs did not ask Ocwen Loan Servicing, LLC to provide information regarding any occurrences <u>prior</u> to its acquisition of the account. Plaintiffs' requests only extended to inquiries regarding any information that Ocwen Loan Servicing, LLC might have received from Ocwen Federal Bank, FSB which not only authorized it to collect payments on its behalf; and information about the amount it had been told to collect from the Plaintiffs.  In addition, the Plaintiffs made every effort to inquire about the relationship between the Defendant(s) and with U.S. Bank National Association and with Citibank, N.A. See page 4 of Plaintiffs' April 12, 2018-Letter as previously submitted as **Exhibits "7"**. Now see the Defendant'(s)' response letter dated June 13, 2018 as **Exhibits "8"**.

24- And that on one occasion, the Defendant(s), in its March 21, 2018-Letter clearly states that U.S. Bank, National Association is the owner and the Trustee of the Plaintiffs' loan, the Trustee for Mortgage Pass-Through Certificates 1998-82. And that Ocwen Loan Servicing, LLC also provided its phone number and address as well; while the Defendant(s) letter dated June 13, 2018 states the exact opposite. The Defendant(s) states in pertinent parts as follows: (1) We are servicing the account for this Trust U.S. Bank, National Association is the Trustee.

25- However, as previously indicated, they **do not** own the account. This is a clear contradiction to what the Defendant(s) told the Plaintiffs within its/their March 21, 2018-Letter. See **Exhibits "9"**. A copy of the Defendant'(s)' March 21, 2018-Letter informing the Plaintiffs about U.S. Bank National Association.

26- If U.S. Bank National Association is the owner or the Trustee, why can't the Defendant(s) get the document that the Plaintiffs requested? If U.S. Bank National Association is not the owner, then under whose authority is the Defendant(s) collecting the Plaintiffs' mortgage? If the Defendant(s) cannot recall or isn't in possession of certain specific details and certain essential information in connection with its acquisition of Plaintiffs' note and mortgage and simply remembers simple details as to how much money it capitalized when it received the $50, 000.00 dollars from the Plaintiffs, how can one believe or accept what the Defendant(s) is claiming? Both cannot be true. And the Plaintiffs believe that this is all part of the games and the fraudulent schemes that the Defendant(s) is/are engaged in in an effort to defraud mortgagors of thousands of dollars.

### COUNT ONE
### Failure to provide accurate payoff balance
### amount upon a borrower's request in
### violation of section 12 CFR 1026.36(c)(3)

27- Paragraphs 8 through 9 above shows a failure to reasonably apply the appropriate amount due on the mortgage; a failure to reasonable apply the same amount and by using the same method that the Referee applied when it reported the total amount due and gave credit to the Plaintiffs accordingly. All the Defendant(s) would have to do is to "pick up" from where the Referee's report ended and use the same guidelines that he established. The Defendant(s) knew or should have known that the Plaintiffs do not owe $201, 344.00. They knew or should have known that the Plaintiffs monthly payment is $1, 376.56. The Defendant(s) knew or should have known of the Referee's report dated April 18, 1996 covered the periods of 4/1/1993 through

01/31/1996 and not the time frame of December 1, 1994 through August 1, 1997. And that a simple calculation, just like what the Plaintiffs have done above, would have been able to cause the Defendant(s) to provide accurate payoff balance amount upon these Plaintiffs' request.

## COUNT TWO
### Failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law, under 12 CFR 1024.35

28- Paragraphs 11, 13, and  14 above describe the Defendant(s) failure to appropriately apply an accepted payment to principal, as it paid too much towards the escrow account. The Defendant(s) knew or should have known that the $50, 000.00 dollars payment made on or about August 1, 1997 should have gone directly to the total amount in arrears. They knew or should have known that the Plaintiffs do not pay $1, 494.00 dollars per month. The Defendant(s) knew or should have known not to apply 33 payments in the sum of $1,494.00 dollars and capitalized an additional amount of $2, 582.42 from the $50, 000.00 dollars to bring the escrow to a positive balance again. The Defendant(s) botched up the Plaintiffs' mortgage account by committing these unlawful acts..

## COUNT THREE
### Failure to transfer accurately and timely information relating to the servicing of a borrower's mortgage loan account to a transferee servicer, under 12 CFR 1024.35(8)

29- Paragraph 10 above describe the Defendant'(s)' failure to properly transfer accurate and timely information relating to the servicing of the Plaintiffs' mortgage loan account. Had the Defendant(s), Ocwen Federal Bank, FSB timely informed the Defendant(s), Ocwen Loan Servicing, LLC about the Plaintiffs' mortgage account, the Defendant(s), Ocwen Loan Servicing, LLC would have timely correct this error. The Defendant(s), Ocwen Loan Servicing, LLC would recommend a forbearance plan to repay that remaining balance. Instead, the Defendant(s) created a Modification Agreement that would further harm the Plaintiffs, causing them unreasonable financial hardship.

## COUNT FOUR
### Defendant(s) provided false representation concerning the character, amount, or legal status of the Plaintiffs' debt, in violation of 15 U.S. Code Section 1692e, and 15 U.S. Code Section 1692j under the RESPA laws.

30- Paragraphs 11, 14, 16, 17, and 19 above describe the false representation concerning the character, amount, or legal status of the Plaintiffs' debt. In that, the Defendant(s) clearly

fabricated a document, an instrument, and provided the same to the Plaintiff, Phenide Joseph. As stated within those paragraphs above, the Defendant(s) sought to mislead the Plaintiffs by acting as though it had the power to provide a loan. The Defendant(s) also sought to convince the Plaintiffs and even itself that the Plaintiff, Phenide Joseph, executed a new note and mortgage as of August 1, 1997 for the purpose of obtaining illegal gains. Such a misrepresentation sought to change the legal status of the loan.

31- In addition, those same selected paragraphs above in conjunction with paragraphs 22, 24, 25, and 26 continue to describe deceptive acts by the Defendant(s). 15 U.S. Code Section 1692j(a) states, "it is unlawful to design, complete, and furnish any form knowing that such form would be used to create a false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact, such person is not so participating." Although it may be premature and the Plaintiffs will find out during discovery, but it is possible, based on the 2 conflicting statements by the Defendant(s) within their 2 letters as described above, that U.S. Bank National Association is not the owner of Plaintiffs' mortgage and that it does not have anything to do with this mortgage. The Defendant(s) may also be creating a false or a deceptive impression within the Plaintiffs' mind. The Plaintiffs wrote to U.S. Bank National Association and are now awaiting a response from them directly.

### COUNT FIVE
### Defendant(s) have failed to validate the debt it/
### they are trying to collect in accordance with 15
### U.S. Code Section 1692g(b)(c)

32- Paragraph 15, together with the letters that are attached to this complaint, demonstrate that the Defendant(s) cannot validate the debt as described in 15 U.S. Code Section 1692g(b)(c). One would assume that the Defendant(s) would request for such information that the Plaintiffs have longed sought for from U.S. Bank, National Association, who the Defendant(s) claim to be the Trustee or Owner of the Note so that the Defendant(s) can validate its clam. But unfortunately, that has not been the case. The Defendant(s) must validate the debt in accordance with the RESPA laws. Plaintiffs have already sent their notice to the Defendant(s) that a large portion of the debt is in dispute as of April of 2018. And lastly, the Defendant(s) must realize that, in accordance with Title 15 of the U.S. Code section 1692g(b)(c), the failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

## THE RELIEF REQUESTED

**Wherefore,** the Plaintiffs request (a) that The Defendant(s) be enjoined and/or restrained from committing any further acts as described in paragraphs 7 through 26 above. (b) That the Defendant(s), in a timely manner, correct or remedy any wrong as described within paragraphs 7 through 26 above, by adhering to and applying the same method of computation that the Referee, Stephan J. Siegel, applied in its April 18, 1996 Report. (c) That the Court, upon a fair show via trial by jury and/or trial by a referee or a master, in accordance with applicable Federal law(s), order the correction of the Plaintiff's mortgage, and rendering the Defendant'(s)' 1997-Modification Agreement null and void. (d) That the Court may award the Plaintiffs with costs for having to commence this action. (e) That the Court may sanction the Defendant(s), accordingly for each violation committed against these Plaintiffs in accordance with applicable Federal laws. (f) That the Cout may include the CFPB as a third-party plaintiff in this action. (g) That the Court may make any and all decision(s) that It seems just and equitable

Suffolk County, New York
Dated: August 15, 2018

Defendant(s) address:
Ocwen Financial Corporation
& Ocwen Loan Servicing, LLC
1661 Worthington Rd., #100
West Palm Beach, Fl., 33409

Phenide Joseph, Pro Se

George Joseph, Pro Se
P.O. Box 8168
Patchogue, New
York 11772

# EXHIBITS "1"

Plaintiffs' Original Note and Mortgage, together with the Assignment of Mortgage

**Mortgage**  **CITICORP ● CITIBANK**

REEL 2895 PAGE 654    New York

## MORTGAGE

**Words Used Often In This Document**

(A) "Mortgage." This document, which is dated ___October 12___ , 19 _89_ , will be called the "Mortgage."

(B) "Borrower." __KARNEST JOSEPH & PHENIDEE JOSEPH__    *Pd # SO IN Crictint*
__residing at   462 East 22nd Street__
__Brooklyn, NY__
_____ will sometimes be called "Borrower" and sometimes simply "I" or "me."

(C) "Lender." CITIBANK, N.A. will be called "Lender." Lender is a corporation or association which was formed and which exists under the laws of the United States of America. Lender's Address is __CITIBANK, N.A.,__
__399 Park Avenue, New York, NY 10043__
(D) "Note." The note signed by Borrower and dated __October 12, 1989__ will be called the "Note." The Note shows that I may owe Lender up to __--($132,000.00)--__
__--ONE HUNDRED THIRTY TWO THOUSAND DOLLARS AND NO/100--__
_____ Dollars plus interest, which I have promised to pay in monthly payments of principal and interest and to pay in full by __November 1, 2019__ . A copy of the Note is annexed hereto as Exhibit A and is made a part of this Mortgage, if your loan is an Adjustable Rate Mortgage.

(E) "Property." The property that is described below in the section titled "Description Of The Property," will be called the "Property."

**Borrower's Transfer To Lender Of Rights In The Property**

I mortgage, grant and convey the Property to Lender subject to the terms of this Mortgage. This means that, by signing this Mortgage, I am giving Lender those rights that are stated in this Mortgage and also those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A)  Pay all the amounts that I owe Lender as stated in the Note;

(B)  Pay, with interest, any amounts that Lender spends under this Mortgage, to protect the value of the Property and Lender's rights in the Property; and

(C)  Keep all of my other promises and agreements under this Mortgage.

**Description Of The Property**

I give Lender rights in the Property described in (A) through (J) below:

(A)  The property which is located at __114-74 224th Street__
__Cambria Heights,__          __NY 11411__ _____ . This property is
in __(City)__    __(State and Zip Code)__    __Queens__  County in the State of New York. It has the following legal description:
ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Fourth Ward, Borough of Queens, City and State of New York and designated on a certain Map entitled "Map of Loan Island Estates, Borough of Queens, New York City" surveyed by Briandsen and Crowell, C.E. and C.S. May 1925 and filed in the Office of the Register of Queens County February 2, 1936 Map No. 4817 as parts of lots numbered 6, 7, 8, 9 and 10 in Block 41, which parts of said lots taken together are more particularly bounded and described with reference to said map as follows:
BEGINNING at a point on the Westerly side of 224th Street, distant 60 feet Northerly from the corner formed by the intersection of the Northerly side of 115th Avenue with the Westerly side of 224th Street;
RUNNING THENCE Westerly and parallel with the Northerly side of 115th Avenue, 100 feet;
RUNNING THENCE Northerly and parallel with the Westerly side of 224th Street, 40 feet;
RUNNING THENCE Easterly and again parallel with the said Northerly side of 115th Avenue, 100 feet to the said Westerly side of 224th Street;
RUNNING THENCE Southerly along the said Westerly side of 224th Street, 40 feet to the point or place of BEGINNING.

✓ This property is or will be improved by one or two family residence or dwelling only.  This is a purchase money mortgage.

Item 303342 (NYPL 401 6.) Rev. 5-86) Pkg. 89  Printing of 9-86

**PAGE 1 OF 9**

*K.J.   PJ*

*Enclosure "1"*

REEL 2095 PAGE 655

*If this property is a condominium, the following must be completed:* This property is part of a condominium project known as _____
(Name of Condominium Project)
_____ (called the "Condominium Project"). This property includes my unit and all of my rights in the common elements of the Condominium Project.

*If this property is in a planned unit development, the following must be completed:* This property is in a development which is a planned unit development known as _____
_____ (called the "PUD"). The PUD was
(Name of Planned Unit Development)
created by _____
(Document Creating PUD)
_____

(B)   All buildings and other improvements that are located on the property described in paragraph (A) of this Section;

(C)   All rights in other property that I have as owner of the property described in paragraph (A) of this Section. These rights are known as "easements, rights and appurtenances attached to the property";

(D)   All rents or royalties from the property described in paragraph (A) of this Section;

(E)   All mineral, oil and gas rights and profits, water, water rights and water stock that are part of the property described in paragraph (A) of this Section;

(F)   All rights that I have in the land which lies in the streets or roads in front of, or next to, the property described in paragraph (A) of this Section;

(G)   All fixtures that are now or in the future will be on the property described in paragraphs (A) and (B) of this Section, and all replacements of and additions to those fixtures, except for those fixtures, replacements or additions that under the law are "consumer goods" and that I acquire more than ten days after the date of the Note. Usually, fixtures are items that are physically attached to buildings, such as hot water heaters;

(H)   All of the rights and property described in paragraphs (B) through (F) of this Section that I acquire in the future;

(I)   All replacements of or additions to the property described in paragraphs (B) through (F) and paragraphs (H) of this Section; and

(J)   All of the amounts that I pay to Lender under Paragraph 2 below.

**Borrower's Right To Mortgage The Property and Borrower's Obligation To Defend Ownership Of The Property**

I promise that except for the "exceptions" listed in any title insurance policy which insures Lender's rights in the Property; (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**UNIFORM PROMISES: I promise and I agree with Lender as follows:**

1.  **Borrower's Promise to Pay Principal And Interest Under The Note And To Fulfill Other Payment Obligations**

I will promptly pay to Lender when due: principal and interest under the Note and late charges and prepayment charges as stated in the Note.

2.  **Agreements About Monthly Payments For Taxes and Insurance**

(A) **Borrower's Obligation to Make Monthly Payments to Lender for Taxes and Insurance**
I will pay to Lender all amounts necessary to pay for taxes, assessments, ground rents (if any), and hazard insurance on the Property and mortgage insurance (if any). I will pay those amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless the law requires otherwise. I will make those payments on the same day that my monthly payments of principal and interest are due under the Note.

The amount of each of my payments under this Paragraph 2 will be the sum of the following:

(i)   One-twelfth of the estimated yearly taxes, assessments and ground rents (if any) on the Property which under the law may be superior to this Mortgage; plus
(ii)   One-twelfth of the estimated yearly premium for hazard insurance covering the Property; plus

Item 307543 (NTFL 101 (I)) Rev. 6-88) Pkg. 50  Printing of 6-88

PAGE 2 OF 9

REEL 2895 PAGE 656

(iii) One-twelfth of the estimated yearly premium for mortgage insurance (any).

Lender will determine from time to time my estimated yearly taxes, assessments, ground rents and insurance premiums based upon existing assessments and bills, and reasonable estimates of future assessments and bills. (Taxes, assessments, ground rents and insurance premiums will be called "taxes and insurance.") The amounts that I pay to Lender for taxes and insurance under this Paragraph 2 will be called the "Funds."

**(B)  Lender's Obligations Concerning Borrower's Monthly Payments for Taxes and Insurance**

Lender will keep the Funds in a savings or banking institution which has its deposits or ac-counts insured or guaranteed by a federal or state agency. If Lender is such an institution then Lender may hold the Funds. Except as described in this Paragraph 2, Lender will use the Funds to pay taxes and insurance. Lender will give to me, without charge, an annual accounting of the Funds. That accounting must show all additions to and deductions from the Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Funds on deposit, for using the Funds to pay taxes and insurance, for analyzing my payments of Funds, or for receiving, verifying and totalling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Funds and if the law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Funds unless either (i) Lender and I agree in writing, at the time I sign this Mortgage, that Lender will pay interest on the Funds; or (ii) the law requires Lender to pay interest on the Funds.

If Lender's estimates are too high or if taxes and insurance rates go down, the amounts that I pay under the Paragraph 2 will be too large. If this happens at a time when I am keeping all of my promises and agreements made in this Mortgage, I will have the right to have the excess amount either promptly repaid to me as a direct refund or credited to my future monthly pay-ments of Funds. There will be excess amounts if, at any time, the sum of (a) the amount of Funds which Lender is holding or keeping on deposit plus (b) the amount of the monthly payments of Funds which I still must pay between that time and the due dates of taxes and insurance, is greater than the amount necessary to pay the taxes and insurance when they are due.

If, when payments of taxes and insurance are due, Lender has not received enough Funds from me to make those payments, I will pay to Lender whatever additional amount is necessary to pay the taxes and insurance in full. I must pay that additional amount in one or more payments as Lender may require.

When I have paid all of the amounts due under the Note and under this Mortgage, Lender will promptly refund to me any Funds that are then being held or kept on deposit by Lender. If, under Paragraph 20 below, either Lender acquires the Property or the Property is sold, then im-mediately before the acquisition or sale, Lender will use any Funds which Lender is holding or has on deposit at that time to reduce the amount that I owe to Lender under the Note and under this Mortgage.

**3.  Lender's Application of Borrower's Payments**

Unless the law requires otherwise, Lender will apply each of my payments under the Note and under Paragraphs 1 and 2 above in the following order and for the following purposes:

(A)  First, to pay the amounts then due to Lender under Paragraph 2 above and late charges, if any;

(B)  Next, to pay interest then due under the Note; and

(C)  Next, to pay principal then due under the Note.

**4.  Borrower's Obligation To Pay Charges And Assessments And To Satisfy Claims Against The Property**

I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be superior to this Mortgage. I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will do this either by making the payments to Lender that are described in Paragraph 2 above or, if I am not required to make payments under Paragraph 2, by making payments, when they are due, directly to the persons entitled to them. (In this Mortgage, the word "person" means any person, organization, governmental authority, or other party.) If I make direct payments, then promptly after making any of those payments I will give Lender a receipt which shows that I have done so. If I make payment to Lender under Paragraph 2, I will give Lender all notices or bills that I receive for the amounts due under this Paragraph 4.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "lien." I will promptly pay or satisfy all liens against the Property that may be superior to this Mortgage. However, this Mortgage does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or (B) I, in good faith, argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up.

REEL 2695 PAGE 657

**Condominium and PUD Assessments**
If the Property includes a unit in a Condominium Project or in a PUD, I will promptly pay, when they are due, all assessments imposed by the owners association or other organization that governs the Condominium Project or PUD. That association or organization will be called the "Owner's Association."

**5. Borrower's Obligation To Obtain And Keep Hazard Insurance On The Property**

**(A)  Generally**
I will obtain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies, and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. It is possible that the insurance policy will have provisions that may limit the insurance company's obligation to pay claims if the amount of coverage is too low. Those provisions are known as "co-insurance requirements." Lender may not require me to obtain an amount of coverage that is more than the larger of the following two amounts: either (i) the amount that I owe to Lender under the Note and under this Mortgage; or (ii) the amount necessary to satisfy the co-insurance requirements.

I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. The form of all policies and the form of all renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals.

I will pay the premiums on the insurance policies either by making payments to Lender, as described in Paragraph 2 above, or by paying the insurance company directly when the premium payments are due. If Lender requires, I will promptly give Lender all receipts of paid premiums and all renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (a) it is not economically possible to make the repairs or restoration; or (b) the use of the proceeds for that purpose would lessen the protection given to Lender by this Mortgage; or (c) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically possible or if it would lessen Lender's protection under this Mortgage, then the proceeds will be used to reduce the amount that I owe to Lender under the Note and under this Mortgage. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. The use of proceeds to reduce the amount that I owe to Lender will not be a prepayment that is subject to the prepayment charge provisions, if any, under the Note.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim for insurance benefits, then Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the amount that I owe to Lender under the Note and under this Mortgage. The 30-day period will begin on the date the notice is mailed or, if it is not mailed, on the date the notice is delivered.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Note, that use will not delay the due date or change the amount of any of my monthly payments under the Note and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.

If Lender acquires the Property under Paragraph 20 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the amount that I owe to Lender under the Note and under this Mortgage immediately before the Property is acquired by Lender or sold.

**(B)  Agreements that Apply to Condominiums and PUD's**
(i)  If the Property includes a unit in a Condominium Project, the Owners Association may maintain a hazard insurance policy which covers the entire Condominium Project. That policy will be called the "master policy." So long as the master policy remains in effect and meets the requirements stated in this Paragraph 5: (a) my obligation to obtain and to keep hazard insurance on the Property is satisfied; (b) I will not be required to include an amount for hazard insurance premiums in my monthly payment of Funds to Lender under Paragraph 2 above; and (c) if there is a conflict, concerning the use of proceeds, between (1) the terms of this Paragraph 5, and (2) the law or the terms of the declaration, by-laws,

 

REEL 2295   685

regulations or other documents creating or governing the Condominium Project, then that law or the terms of those documents will govern the use of proceeds. I will promptly give Lender notice if the master policy is interrupted or terminated. During any time that the master policy is not in effect the terms of (a), (b) and (c) of this subparagraph 5(B)(i) will not apply.

(ii)   If the Property includes a unit in a Condominium Project, it is possible that proceeds will paid to me instead of being used to repair or to restore the Property. I give Lender my rights to those proceeds. If the Property includes a unit in a PUD, it is possible that proceeds will be paid to me instead of being used to repair or to restore the common areas or facilities of the PUD. I give Lender my rights to those proceeds. All of the proceeds described in this subparagraph 5(B) (ii) will be paid to Lender and will be used to reduce the amount that I owe to Lender under the Note and under this Mortgage. If any of those proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. The use of proceeds to reduce the amount that I owe to Lender will not be a prepayment that is subject to the prepayment charge provisions, if any, under the Note.

| 6. Borrower's Obligation To Maintain The Property And To Fulfill Obligations In Lease, And Agreements About Condominiums And PUD's | **(A)   Agreements about Maintaining the Property and Keeping Promises in Lease**<br>I will keep the Property in good repair. I will not destroy, damage or substantially change the Property, and I will not allow the Property to deteriorate. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. |
|---|---|

**(B)   Agreements that Apply to Condominiums and PUD's**
If the Property is a unit in a Condominium Project or in a PUD, I will fulfill all of my obligations under the declaration, by-laws, regulations and other documents that create or govern the Condominium Project or PUD. Also, I will not divide the Property into smaller parts that may be owned separately (known as "partition or subdivision"). I will not consent to certain actions unless I have first given Lender notice and obtained Lender's consent in writing. Those actions are:

(i)   The abandonment or termination of the Condominium Project or PUD, unless, in the case of a condominium, the abandonment or termination is required by law;

(ii)   Any significant change in the declaration, by-laws or regulations of the Owners Association, trust agreement, articles of incorporation, or other documents that create or govern the Condominium Project or PUD, including, for example, a change in the percentage of ownership rights, held by unit owners, in the Condominium Project or in the common areas or facilities of the PUD;

(iii)   A decision by the Owners Association to terminate professional management and to begin self-management of the Condominium Project or PUD; and

(iv)   The transfer, release, creation of liens, partition or subdivision of all or part of the common areas and facilities of the PUD. (However, this provision does not apply to the transfer by the Owners Association of rights to use those common areas and facilities for utilities and other similar or related purposes.)

| 7. Lender's Right To Take Action To Protect The Property | If: (A) I do not keep my promises and agreements made in this Mortgage, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as, for example, a legal proceeding in bankruptcy, in probate, for condemnation, or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions under this Paragraph 7 may include, for example, appearing in court, paying reasonable attorneys' fees, and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. |
|---|---|

I will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 7. This Mortgage will protect Lender in case I do not keep this promise to pay those amounts with interest.

I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the same rate stated in the Note. However, if payment of interest at that rate would violate the law, I will pay interest on the amounts spent by Lender under this Paragraph 7 at the highest rate that the law allows. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this Paragraph.

Although Lender may take action under this Paragraph 7, Lender does not have to do so.

| 8. Lender's Right To Inspect The Property | Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before one of those inspections is made, Lender must give me notice stating a reasonable purpose for the inspection. That purpose must be related to Lender's rights in the Property. |
|---|---|

Item 367243 (NTPL 491 (L) Rev. 5-88) Pkg. 50 Printing at 9-88

PAGE 5 OF 9

REEL 2035 PAGE 659

**9. Agreements About Condemnation Of The Property**

A taking of property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (A) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the amount that I owe to Lender under the Note and under this Mortgage. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will only be reduced by the amount of proceeds multiplied by the following amount: (i) the total amount that I owe to Lender under the Note and under this Mortgage immediately before the taking, divided by (ii) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me. The use of proceeds to reduce the amount that I owe to Lender will not be a prepayment that is subject to the prepayment charge provisions, if any, under the Note.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, then Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the amount that I owe to Lender under the Note and under this Mortgage. The 30-day period will begin on the date the notice is mailed or, if it is not mailed, on the date the notice is delivered.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Note, that use will not delay the due date or change the amount of any of my monthly payments under the Note and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.

**Condemnation of Common Areas of PUD**
If the Property includes a unit in a PUD, the promises and agreements in this Paragraph 9 will apply to a condemnation, or sale to avoid condemnation, of the PUD's common areas and facilities as well as of the Property.

**10. Continuation Of Borrower's Obligations**

Lender may allow a person who takes over my rights and obligations to delay or to change the amount of the monthly payments of principal and interest due under the Note or under this Mortgage. Even if Lender does this, however, that person and I will both still be fully obligated under the Note and under this Mortgage unless the conditions stated in Paragraph 19 below have been met.

Lender may allow those delays or changes for a person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Note or under this Mortgage, even if Lender is requested to do so.

**11. Continuation Of Lender's Right**

Even if Lender does not exercise or enforce any right of Lender under this Mortgage or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will still have the right, under Paragraph 20 below, to demand that I make Immediate Payment In Full (see Paragraph 20 for a definition of this phrase) of the amount that I owe to Lender under the Note and under this Mortgage.

**12. Lender's Ability To Enforce More Than One Of Lender's Rights**

Each of Lender's rights under this Mortgage is separate. Lender may exercise and enforce one or more of those rights, as well as any of Lender's other rights under the law, one at a time or all at once.

**13. Obligations Of Borrowers And Of Persons Taking Over Borrower's Rights Or Obligations; Agreements Concerning Captions**

Subject to the terms of Paragraph 19 below, any person who takes over my rights or obligations under this Mortgage will have all of my rights and will be obligated to keep all of my promises and agreements made in this Mortgage. Similarly, any person who takes over Lender's rights or obligations under this Mortgage will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Mortgage.

If more than one person signs this Mortgage as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Mortgage. Lender may enforce Lender's rights under this Mortgage against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under the Note and under this Mortgage. However, if one of us does not sign the Note, then: (A) that person is signing this Mortgage only to give that person's rights in the Property to Lender under the terms of this Mortgage; and (B) that person is not personally obligated to make payments or to act under the Note or under this Mortgage.

The captions and titles of this Mortgage are for convenience only. They may not be used to interpret or to define the terms of this Mortgage.

 

RILL 2C35A 6C0

| 14. | Agreements About Giving Notices Required Under This Mortgage | Unless the law requires otherwise, any notice that must be given to me under this Mortgage will be given by delivering it or by mailing it addressed to me at the address stated in the section above titled "Description Of The Property." A notice will be delivered or mailed to me at a different address if I give Lender a notice of my different address. Any notice that must be given to Lender under this Mortgage will be given by mailing it to Lender's address stated in Paragraph (C) of the section above titled "Words Used Often In This Document." A notice will be mailed to Lender at a different address if Lender gives me a notice of the different address. A notice required by this Mortgage is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14. |
|---|---|---|
| 15. | Agreements About Uniform Mortgage And Law That Governs This Mortgage | This is a "Uniform Mortgage." It contains "uniform promises" that are in mortgages used all over the country and also "non-uniform promises" that vary, to a limited extent, in different parts of the country.<br><br>The law that applies in the place that the Property is located will govern this Mortgage. (The foregoing sentence shall not limit the applicability of federal law to this Mortgage.) If any term of this Mortgage or of the Note conflicts with the law, all other terms of this Mortgage and of the Note will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Mortgage and of the Note which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced. |
| 16. | Borrower's Copy Of The Note And Of This Mortgage | I will be given a copy of the Note and of this Mortgage. Those copies must show that the original Note and Mortgage have been signed. I will be given those copies either when I sign the Note and this Mortgage or after this Mortgage has been recorded in the proper official records. |
| 17. | Agreements That Apply to VA Loans | A loan that is guaranteed or insured by the United States Veterans Administration is known as a "VA loan." If the loan that I promise to pay in the Note is a VA loan, then my rights and obligations, as well as those of Lender, are governed by that law which is known as Title 38 of the United States Code and the Regulations made under that Title (called the "VA Requirements"). One or more terms of this Mortgage, or of other documents that are signed in connection with my VA loan, might conflict with the VA Requirements. For example, the prepayment terms in the Note or Paragraph 19 of this Mortgage might conflict with the VA Requirements. Lender and I agree that if there is a conflict, the conflicting terms of this Mortgage or other documents are modified or eliminated as much as is necessary to make all of the conflicting terms agree with the VA Requirements. |
| 18. | Borrower's Obligations To Pay Mortgage Insurance Premiums | If Lender required mortgage insurance as a condition of making the loan that I promise to pay under the Note, I will pay the premiums for that mortgage insurance. I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law. Lender may require me to pay the premiums in the manner described in Paragraph 2 above. |

**NON-UNIFORM PROMISES: I also promise and agree with Lender as follows:**

| 19. | Agreements About Assumption Of This Mortgage And About Lender's Rights If Borrower Transfers The Property Without Meeting Certain Conditions | If I sell or transfer all or part of the Property or any rights in the Property, any person to whom I sell or transfer the Property may take over all of my rights and obligations under this Mortgage (known as an "assumption of the Mortgage") if certain conditions are met. Those conditions are: (A) I give Lender notice of the sale or transfer, (B) Lender agrees that the person's credit is satisfactory; (C) the person agrees to pay interest on the amount owed to Lender under the Note and under this Mortgage at whatever rate Lender requires; and (D) the person signs an assumption agreement that is acceptable to Lender and that obligates the person to keep all of the promises and agreements made in the Note and in this Mortgage. If I sell or transfer the Property and each of the conditions in (A), (B), (C) and (D) of this Paragraph 19 is satisfied, Lender will release me from all of my obligations under the Note and under this Mortgage.<br><br>If I sell or transfer the Property and the conditions in (A), (B), (C) and (D) of this Paragraph 19 are not satisfied, I will still be fully obligated under the Note and under this Mortgage and Lender may require Immediate Payment In Full, as that phrase is defined in Paragraph 20 below. However, Lender will not have the right to require Immediate Payment In Full as a result of certain transfers. Those transfers are: (i) the creation of liens or other claims against the Property that are inferior to this Mortgage; (ii) a transfer of rights in household appliances, to a person who provides me with the money to buy those appliances, in order to protect that person against possible losses; (iii) a transfer of the Property to surviving co-owners, following the death of a co-owner, when the transfer is automatic according to law; (iv) leasing the Property for a term of three years or less, as long as the lease does not include an option to buy.<br><br>If Lender requires Immediate Payment In Full under this Paragraph 19, Lender will send me, in the manner described in Paragraph 14 above, a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or, if it is not mailed, the date the notice is delivered. If I do not |

Item 359342 (N7FL 431 (S) Rev. 6-68) Pkg. 50 Printing of 9-66

*K.J.*                *P.J.*

PAGE 7 OF 9

REEL 2895·A   661

make the required payment during that period, Lender may bring a lawsuit for "foreclosure and sale" under Paragraph 20 below without giving me any further notice or demand for payment. (See Paragraph 20 for a definition of "foreclosure and sale.")

**20. Lender's Rights If Borrower Fails To Keep Promises And Agreements**

If Lender requires Immediate Payment In Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and to have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs allowed by law.

Lender may require Immediate Payment In Full under this Paragraph 20 only if all of the following conditions are met:

(A)   I fail to keep any promise or agreement made in this Mortgage, including the promises to pay when due the amounts that I owe to Lender under the Note and under this Mortgage; and

(B)   Lender sends to me, in the manner described in Paragraph 14 above, a notice that states:

(i)   The promise or agreement that I failed to keep;
(ii)   The action that I must take to correct that failure;
(iii)   A date by which I must correct the failure. That date must be at least 30 days from the date on which the notice is mailed to me, or, if it is not mailed, from the date on which it is delivered to me;
(iv)   That if I do not correct the failure by the date stated in the notice, I will be in default and Lender may require Immediate Payment In Full, and Lender or another person may acquire the Property by means of foreclosure and sale;
(v)   That I may speak with a named representative of Lender to discuss any questions which I have about the things stated in the notice;
(vi)   That if I meet the conditions stated in Paragraph 21 below, I will have the right to have any lawsuit for foreclosure and sale discontinued and to have the Note and this Mortgage remain in full effect as if Immediate Payment In Full had never been required; and
(vii)   That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Note and under this Mortgage, and to present any other defenses that I may have; and

(C)   I do not correct the failure stated in the notice from Lender by the date stated in that notice.

**21. Borrower's Right To Have Lender's Lawsuit For Foreclosure And Sale Discontinued**

Even if Lender has required Immediate Payment In Full, I may have the right to have discontinued any lawsuit brought by Lender for foreclosure and sale or for other enforcement of this Mortgage. I will have this right at any time before a judgment has been entered enforcing this Mortgage if I meet the following conditions:

(A)   I pay to Lender the full amount that would have been due under this Mortgage and the Note if Lender had not required Immediate Payment In Full; and

(B)   I correct my failure to keep any of my other promises or agreements made in this Mortgage; and

(C)   I pay all of Lender's reasonable expenses in enforcing this Mortgage including, for example, reasonable attorneys' fees; and

(D)   I do whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Mortgage, and my obligations under the Note and under this Mortgage continue unchanged.

If I fulfill all of the conditions in this Paragraph 21, then the Note and this Mortgage will remain in full effect as if Immediate Payment In Full had never been required.

**22. Lender's Rights To Rental Payments From The Property And To Take Possession Of The Property**

As additional protection for Lender, I give to Lender all of my rights to any rental payments from the Property. However, until Lender requires Immediate Payment In Full under Paragraph 19 or 20 above, or until I abandon the Property, I have the right to collect and keep those rental payments as they become due. I have not given any of my rights to rental payments from the Property to anyone else, and I will not do so without Lender's consent in writing.

If Lender requires Immediate Payment In Full under Paragraph 19 or 20 above, or if I abandon the Property, then Lender, persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B) enter on and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change leases. I agree that if Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 22, the tenants may make those rental payments to Lender without having to ask whether I have failed to keep my promises and agreements under this Mortgage.

form 351243 (MTP), 401 (L) Rev. 8-88) Pkg.50   Printing of 9-88

_K.J._          _R.J_

PAGE 8 OF 9

REEL 2895 662

If there is a judgment for Lender in a lawsuit for foreclosure and sale, I will pay to Lender reasonable rent from the date the judgment is entered for as long as I occupy the Property. However, this does not give me the right to occupy the Property.

All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph 22, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the amount that I owe to Lender under the Note and under this Mortgage. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees, and the cost of any necessary bonds. Lender and the receiver will be obligated to account only for those rental payments that they actually receive.

**Paragraph 23 has been intentionally deleted.**

24. **Lender's Obligation To Discharge This Mortgage When The Note And This Mortgage Are Paid In Full**
When Lender has been paid all amounts due under the Note and under this Mortgage, Lender will discharge this Mortgage by delivering a certificate that this Mortgage has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

25. **Agreements About New York Lien Law**
I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date this Mortgage is recorded in the proper official records, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, I will: (A) hold all amounts, which I receive and which I have a right to receive from Lender under the Note as a "trust fund"; and (B) use those amounts to pay for that construction or work before I use them for any other purpose. The fact that I am holding those amounts as a "trust fund" means that I have a special responsibility under the law to use the amounts in the manner described in this Paragraph 25.

By signing this Mortgage I agree to all of the above.

Witnesses:

_____          _Karnest Joseph_____
                                          KARNEST JOSEPH                    Borrower
_____          _Phenidex Joseph_____
                                          PHENIDEX JOSEPH                   Borrower
_____          _____  Borrower
_____          _____  Borrower

STATE of ___NEW YORK___ )
                        ) : ss.:
COUNTY of ___KINGS___   )

On this ___12th___ day of ___October___, 19_89_, before me personally came _____

KARNEST JOSEPH
PHENIDEX JOSEPH

to me known and known to me to be the individual(s) described in and who executed the foregoing instrument and, the y duly acknowledged to that they executed the same.

Item 357343 (NYPL 401 (L) Rev. 5-88) Pkg. 60 Printing of 5-88

PAGE 9 OF 9

Notary Public

**(Space Below This Line Reserved For Lender and Recorder)**

Loan No. 156 B 3320
Title No. E967546

KARNEST JOSEPH
PHENIDEX JOSEPH
to
CITIBANK, N.A.

Town/Village: QUEENS
County: 
State of New York
Section: 49
Block: 11267
Lot(s): 83

RECORD AND RETURN TO:
CITICORP MORTGAGE, INC.
P.O. BOX 790034
MAIL STATION 434C
ST. LOUIS, MO 63134

| Mortgage Rider | | CITICORP CITIBANK |

REEL 2895 PAGE 663

New York

## RIDER ATTACHED TO AND FORMING PART OF MORTGAGE TO CITIBANK, N.A.

Type of Loan: [XX] Purchase Money Mortgage

☐ Refinance

MADE BY   KARNEST JOSEPH
          PHENIDES JOSEPH

DATED   October 12, 1989

**26. Agreements About Conflicting Provisions In The Mortgage And This Rider**

This Rider is a writing attached to the Mortgage and the provisions contained in this Rider are part of the mortgage. I agree that if the provisions that are contained in this Rider are in conflict with the terms in the printed Mortgage and the Note, then the provisions of the Rider will control over the provisions in the printed Mortgage and the Note. If the Mortgage is assigned by the Lender, all or any portion of this Rider may, at the option of the assignee, be deemed null and void.

**27. Lender's Rights If Borrower Fails To Keep Promises And Agreements**

The provisions of this Paragraph 27 shall supercede and take the place of the provisions of Paragraph 20 of the Mortgage:

If any of the events stated in subparagraphs (A) through (I) occur, Lender may require that I pay immediately the entire amount then unpaid under the Note and/or secured by the Mortgage or this Rider. Lender may do this without making a further demand for payment. This requirement will be called "Immediate Payment In Full."

If Lender requires Immediate Payment In Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and to have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs allowed by law.

Lender may require Immediate Payment In Full if:

(A) I fail to pay any amounts I owe to Lender under the Note, the Mortgage and/or this Rider within fifteen (15) days after the due date for such payments; or

(B) I fail to keep any other promise or agreement made in the Mortgage and/or this Rider; or

(C) without Lender's prior written consent (i) I assign the rents from all or any part of the Property, or (ii) I receive or collect rent from any tenant of all or any part of the Property for more than one month in advance; or

(D) I fail to comply with any requirement, order or notice of a violation of a law or ordinance within three (3) months after the requirement, order or notice is issued by a governmental department claiming authority over the Property; or

(E) Lender applies to two or more fire insurance companies lawfully doing business in the State of New York and these insurance companies refuse to issue policies insuring the buildings on the Property; or

(F) any fixture or article of personal property that is covered by the Mortgage is wholly or partially removed, demolished or destroyed. A "fixture" is personal property that is attached to land or a building. However, there cannot be a demand for an Immediate Payment In Full if (i) the personal property or fixture that is removed, demolished or destroyed is promptly replaced by similar property that is at least equal in quality and condition, and (ii) I am the sole owner of this replacement property and it is free from any lien or claim; or

(G) any law is passed (i) deducting from the value of the land for the purpose of taxation any lien on the land or (ii) changing in any way the taxation of mortgages or debts secured by a mortgage for state or local purposes, and thirty (30) days have elapsed after passage of any such law; or

(H) I use the Property for any unlawful purpose, or if the Property is used for any purpose by which the risk of fire or other hazard is increased, unless Lender gives written consent prior to these unauthorized uses; or

(I) a lawsuit is begun for foreclosure and sale or any other action or proceeding is begun to collect any lien that is inferior to the Mortgage.

Item 267350 (NTPL 402 8) Rev. 6/88) Pkg. 60 Printing of 9-6A

PAGE 1 OF 3

REEL 2035 PAGE 664

**28. Lender's Rights According To Section 254 Of The New York Real Property Law**

Lender will be entitled to certain rights and advantages according to a law known as Section 254 of the New York Real Property Law ("Section 254"). The provisions of the Mortgage and this Rider will be construed as provided in Section 254, except that Section 254 will not apply to Paragraph 5 of the Mortgage or Paragraph 38 of this Rider. All of Lender's rights and advantages as set forth in the Mortgage or this Rider are supplemental to, and do not replace, any of Lender's rights under Section 254. None of Lender's rights shall be to the exclusion of any other rights, and nothing Lender does shall be construed to be an election to enforce any one right to the exclusion of any other rights.

**29. Agreements About Lender's Rights With Regard To A Foreclosure Search, Appointment Of A Receiver And A Foreclosure And Sale**

If I do not keep my promises and agreements made in the Mortgage or this Rider, Lender may obtain a "foreclosure search" from a title insurance company. If I correct my failure to keep my promises and agreements before a lawsuit for foreclosure and sale begins, I agree to pay the cost of the foreclosure search together with any other sums required to cure my failure.

If Lender, or any person who takes over Lender's rights or obligations under the Mortgage, begins a lawsuit for foreclosure and sale, then Lender is entitled to have a receiver appointed by the court. This receiver may be appointed without Lender giving notice to me. I give Lender the right to have a receiver appointed, whether or not the value of the Property is worth more than the amount I owe on the Mortgage or this Rider.

If there is a foreclosure and sale, I agree that all of the Property or any part of the Property this is affected by the Mortgage or this Rider may be sold together as one unit.

**30. Borrower's Obligations To Deliver Receipts To Lender; Lender's Right To Make Payments**

I will deliver to Lender any receipts I receive for the payment of all taxes, assessments, water rates and sewer rents within ten (10) days after Lender requests these receipts. If I do not deliver these receipts after Lender's request, Lender may make these necessary payments as provided in Paragraph 7 of the Mortgage.

**31. Borrower's Obligation To Make Statement Of Amount Due On Mortgage and If Any Deductions Or Defenses Exist Against The Amount Due On Mortgage**

I will furnish a written statement of the amount due on the Mortgage and this Rider and whether any deductions or defenses exist against the amount due on the Mortgage and this Rider upon the request of Lender. If the Lender makes the request in person, then I will furnish the statement within five (5) days. If Lender makes the request by mail, I will furnish the statement within eight (8) days. I will duly acknowledge any statement I make under this Paragraph. An "acknowledgement" is a formal declaration before a notary public or other authorized official by the person who signs the statement.

**32. Lender's Rights If There Is A Change Of Ownership Of The Property**

The provisions of this Paragraph 32 shall supercede and take the place of the provisions of Paragraph 19 of the Mortgage:

If I sell or transfer the Property, I will still be fully obligated under the Note and under the Mortgage and Lender may require Immediate Payment In Full, as that phrase is defined in Paragraph 27 of this Rider. However, Lender will not have the right to request Immediate Payment In Full as a result of certain transfers. Those transfers are: (i) the creation of liens or other claims against the Property that are inferior to the Mortgage; (ii) a transfer of rights in household appliances, to a person who provides me with the money to buy those appliances, in order to protect that person against possible losses; and (iii) a transfer of the Property to surviving co-owners, following the death of a co-owner when the transfer is automatic according to law.

If Lender requires Immediate Payment In Full under this Paragraph 32, Lender will send me, in the manner described in Paragraph 14 of the Mortgage, a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or, if it is not mailed, on the date the notice is delivered. If I do not make the required payment during that period, Lender may bring a lawsuit for "foreclosure and sale" under Paragraph 27 of this Rider without giving me any further notice or demand for payment. (See Paragraph 27 of this Rider for a definition of "foreclosure and sale.")

**33. Principal Residence**

I will reside in the Property for at least six (6) months of every calendar year.

**34. Borrower's Obligation To Pay Interest If Lender Demands Immediate Payment In Full**

If Lender demands Immediate Payment In Full, interest will be payable from the date Lender makes such demand at the applicable rate stated in the Note (or in a modification of the Note, if any), or at the highest rate of interest the law allows, if such rate is higher than the applicable rate stated in the Note.

**35. Borrower's Obligation To Pay A Late Charge If Borrower's Payment Is Overdue**

If any payment(s) becomes overdue and has not been received by Lender within fifteen (15) days from the due date, a late charge may be charged by Lender. The late charge will be an amount equal to two (2%) percent of such payment that is overdue. The late charge may be deducted from my funds (or the funds of any subsequent owner of the Property). The late charge will be a lien on the Property secured by the Mortgage.

Item 357250 (NTPL 462 (1) Rev. 648) Pg. 55 Printing of 9-88

**PAGE 2 OF 3**

REEL 2895 PAGE 665

**36. Agreements About Which Persons Are Bound By The Promises In This Mortgage**

The Mortgage and this Rider may not be changed or ended orally. The promises contained in the Mortgage and this Rider will run with the land and bind and take effect for me and any person who takes over my rights or obligations and all persons who may have an interest in the Property. The promises will also bind and take effect for the benefit of Lender and any person who takes over Lender's rights and obligations under the Mortgage and this Rider. A promise that "runs with the land" is a promise under which the liability for performance or the right to performance passes to a subsequent owner of the land or any person who obtains rights and obligations with respect to the land.

**37. Agreement About Lender's Obligation To Satisfy Or Discharge Mortgage When Paid In Full**

When Lender has been paid all amounts due under the Note, the Mortgage and this Rider, Lender will discharge the Mortgage by executing a certificate stating that the Mortgage has been satisfied. If I prepare the certificate and present it to Lender, I will not be required to pay Lender for the discharge. If I ask Lender to prepare the certificate, I will pay Lender's counsel a reasonable fee of not less than $50 for the preparation of the certificate. I will pay all costs of recording the discharge in the proper official records.

**38. Hazard Insurance Proceeds**

If any hazard insurance proceeds are received because of damage to the Property, Lender may use the proceeds to repay all amounts I owe under the Note, the Mortgage, or this Rider; or Lender may use or make available to me all or part of the proceeds to repair the damage to the Property; or I may use the proceeds for any other purpose Lender approves of (but Lender does not have to see to the proper use of any proceeds paid over to me). In the event of loss or damage to the Property, if I do not promptly make proof of loss to the insurance company, Lender is hereby appointed my attorney-in-fact with full and absolute authority to (i) make such proof of loss, (ii) compromise and settle any claim for loss, and (iii) give releases or acquittances to the insurance company in connection with such settlement of any claim for insurance proceeds. Lender's appointment as my attorney-in-fact is irrevocable and coupled with an interest, with full power of substitution, and shall not be affected by my subsequent disability or incompetence. Each insurance company concerned is hereby authorized and directed to pay such proceeds directly to Lender instead of jointly to me and Lender. If hazard insurance proceeds are used to repay the sums I owe under the Note, the Mortgage, or this Rider, such proceeds shall be applied to those installments of principal last coming due.

**39. Condemnation Proceeds**

If any proceeds are payable with respect to the Property because of an exercise of eminent domain, condemnation, or other taking, the right to such proceeds and the use of such proceeds shall be governed by, and applied in accordance with, the provisions of Paragraph 38 of this Rider as if such proceeds were hazard insurance proceeds.

**40. Lender's Right Of Set-Off**

If I am in default under the Note, the Mortgage or this Rider, in addition to any other rights that Lender has under the Note, the Mortgage or this Rider, Lender shall have such rights of set-off as may be permitted by applicable law.

**41. Warranty Of Title**

The following sentence contained on page 2 of the Mortgage is hereby deleted:

I promise that except for the "exceptions" listed in any title insurance policy which insures Lender's rights in the Property: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property.

The following sentence is hereby added to and shall take the place of the foregoing:

I promise that except for the "exceptions" listed in the title report or title abstract for the Property, updated to the date of the Mortgage, which has been delivered to Lender; (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; (C) there are no outstanding claims or charges against the Property; and (D) the Mortgage constitutes a valid first lien on the Property.

**42. No Oral Modifications Of The Mortgage**

The Mortgage and this Rider may not be changed or ended orally.

**43. Purchase Money Mortgage**

If the Type of Loan is designated on page 1 as a "purchase money mortgage," that means this Mortgage was made by the purchaser of property to obtain all or a part of the money required to purchase the Property.

**44. Governing Law**

The Mortgage and this Rider shall be governed by federal law; where federal law is silent, the laws of New York will be applied. In the event of a conflict between any provision of the Mortgage or this Rider and any applicable federal statute, law or regulation or New York statute, law or regulation, to the extent of such conflict applicable federal law shall govern, or if federal law is silent, applicable New York law shall govern. In such event, the conflicting provision of the Mortgage or this Rider shall be without effect. All other provisions of the Mortgage and this Rider will remain fully effective and enforceable. The Note shall be construed in accordance with the applicable provisions of the Note.

_____  Borrower

_____  Borrower

_____  
EARNEST JOSEPH        Borrower

_____  
PHENIDEE JOSEPH       Borrower

Item 357330 (9/1FL 692 (1) Rev. 6-88) Pkg 50 Printing of 9-88

PAGE 3 OF 3

REEL 2895 - PAGE 660

RECORDED BY
APPLE ABSTRACT CORP

DLS# 9676230

LOAN NO: ___156 B 3320___

TITLE NO: ___E967546___

TO
CITIBANK, N.A.

KARNEST JOSEPH
PHENIDES JOSEPH

COUNTY: ___QUEENS___

STATE OF: ___NEW YORK___

TOWN/VILLAGE:

SECTION: ___49___

BLOCK: ___11267___

LOT(S): ___83___

RECORD AND RETURN TO:

CITICORP MORTGAGE, INC.
P.O. BOX 790034
MAIL STATION 434C
ST. LOUIS, MO 63134

LOC. VER.
BY ADDRESS: _____

RECEIVED
OCT 25 1989
CITY REGISTER

10-26-89   8-01   MTGETX   PAID   $1,755.00

10-26-89   8-01   MORT   PAID   $41.00

REEL 4656 PG 1719

### Assignment of Note and Mortgage

This instrument prepared by:

Citicorp Mortgage, Inc.
c/o Ocwen Federal Bank FSB
1665 Palm Beach Lakes Blvd.
West Palm Beach, FL 33401
Prepared by: Ed Alonzo

Name:

Upon recordation, return to:

Court Explorers, Inc.
300 Rector Place
New York, NY 10280
Attn: Tim Collins (Citi97)

## ASSIGNMENT OF MORTGAGE/DEED TO SECURE DEBT/
## BENEFICIAL INTEREST UNDER DEED OF TRUST

=====================================

(hereinafter this "**Assignment**")

In consideration of the sum of $10 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned a corporation duly organized and existing under the laws of the State of Delaware with offices at 15851 Clayton Road West, Ballwin, MO 63188, as Attorney In Fact for Citibank, N.A., a national banking association ("**Assignor**"), does hereby grant, bargain, sell, convey, assign, transfer, and set over unto _____, a _____
_____ of _____, with offices at _____
_____, ("**Assignee**"), all of Assignor's right, title and interest, of any kind whatsoever, including, without limitation, that of mortgagee, beneficiary or lender (as the case may be) in and to the mortgage/deed of trust/deed to secure debt (as the case may be) described on Schedule I attached hereto (the "**Mortgage**"), the bond(s), note(s) and/or obligation(s) secured thereby, the moneys due and to grow due thereon with interest as specified therein, all rights accrued or to accrue under said mortgage, and in any and all other related security instruments

**OCWEN FEDERAL BANK** FSB
1665 Palm Beach Lakes Blvd, #105
West Palm Beach, FL 33401

0000676210

2855070

REEL 4656 PG 1720

In the event the Mortgage encumbers premises in the State of New York, and in compliance with Section 275 of the New York Tax Law, the Assignor hereby certifies that the Assignee is not a nominee of the Mortgagor (or of a successor-in-interest to the Mortgagor) and that the Mortgage continues to secure a bona-fide indebtedness and/or obligation.

**IN WITNESS WHEREOF**, the undersigned by its duly elected officers (who for purposes of real property, if any, located in the District of Columbia, are hereby appointed as its attorneys-in-fact) and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this Assignment.

**DATE:** 5·29·97

**ASSIGNOR:** **Citicorp Mortgage, Inc.**
**as Attorney In Fact for Citibank, N.A., a**
**national banking association**

By: _Charles H Stern_
Charles H. Stern
**Assistant Vice President**

As to Georgia and Louisiana Properties Only:

Notary Public

*Power of Attorney Recorded*
*Date 7-20-88*
*Book 2641 Page 2032*

0009676230
285070

REEL 4 6 5 6 PG 1 7 2 1

## MULTI-STATE CORPORATE ACKNOWLEDGMENT
### (For use in all states except GA & LA)

STATE OF MISSOURI )
) ss.:
COUNTY OF ST. LOUIS )

On this 29th day of ___MAY___ , 1997 , before me, the
undersigned officer, personally appeared Charles H. Stern, personally known and acknowledged
himself to me (or proved to me on the basis of satisfactory evidence) to be the Assistant Vice
President of Citicorp Mortgage, Inc. and that as such an officer, being duly authorized to do so
pursuant to its bylaws or a resolution of its board of directors, executed, subscribed and
acknowledged the foregoing instrument for the purposes therein contained, by signing the name
of the corporation by himself in his authorized capacity as such an officer as his free and voluntary
act and deed and the free and voluntary act and deed of said corporation.

**IN WITNESS WHEREOF,** I hereunto set my hand and official seal.

_Robyn Hackworth_
Notary Public

NOTARIAL SEAL                    My Commission Expires:

_____

ROBYN HACKWORTH
NOTARY PUBLIC — NOTARY SEAL
STATE OF MISSOURI
ST. LOUIS COUNTY
MY COMMISSION EXP. MAY 24,1998

0009676230
2855670

REEL 4 6 5 6 PG 1 7 2 2

## Schedule 1

### Description of Mortgages

Mortgage/Deed of Trust/Deed to Secure Debt

Mortgagor/Trustor: KARNEST JOSEPH & PHENIDE JOSEPH

Trustee (if any): _____

Mortgagee/Beneficiary/Lender: Citibank, N.A.

Dated: October 12, 1989

Recorded: October 26, 1989

Book/Volume/Reel: 2895   Page/Folio: 654

Document/Instrument No.: CG18780

Registry Cert. No.: _____

Encumbering premises described therein located in the

County of Queens

State of NY

[x] Tax Lot Designation [check if applicable]
[x] More particularly described on Exhibit A hereto [check if attached].

0009676230
2855670

REEL 4 6 5 6 PG 1 7 2 3

## Exhibit A

Tax Parcel ID/Pin No. Designation: Queens (County), NY
Section: 49  Lot : 83  Block : 11267

Property Address for the Premises: 114-74 224TH STREET
CAMBRIA HEIGHTS, NY

0009676230
2855070

REEL 4 6 5 6 PG 1 7 2 4

## ORIGINAL PRINCIPAL AMOUNT OF MORTGAGE RECITAL

The original Principal amount of the Mortgage is $132,000.00

0009616230
2855070

# EXHIBIT "2"

The Referee's Report

12/31/2006

NEW YORK SUPREME COURT
COUNTY OF QUEENS:  I.A.S. PART 5

RECEIVED BY
WEST PALM BEACH
JUL 17 2017

---------------------------------------------------------x

CITIBANK, N.A.,

**REPORT OF**
**COMPUTATION**

Plaintiff,

-against-

KARNEST JOSEPH, ET AL.,                    Index No. 24433/93

Defendants.

---------------------------------------------------------x

By an order of the Court dated December 27, 1995, this matter was set down

for a hearing to compute.  Appearing on behalf of the plaintiff was CERTILMAN,

BALIN, ADLER & HYMAN, LLP, by MICHAEL MANNIELLO and RENE

CEUSTERS, an officer of the plaintiff CITIBANK.

Appearing on behalf of the defendants was their son, GEORGE JOSEPH, who

swore pursuant to the penalties of perjury that he was authorized to represent his

parents.

The plaintiffs initially claimed their right to judgment in the amount of

$177,716.08.

The defendants claimed numerous credits and additionally that the defendants

contested the amount due and claimed that they were overcharged and in fact owed

$162,696.31.  At the hearing and in memoranda submitted thereafter, exhibits were

introduced by the defendant showing that they were entitled to a credit of $12,472.53

by virtue of payments that had been received by the plaintiff but not credited to their

account.  The plaintiff alleged that these payments were not made and that defendants

were not entitled to the credit.  Plaintiffs failed to produce any evidence to rebut this



DOCUMENTS SCANNED PIOR TO 12/31/2006

RECEIVED BY
WEST PALM BEACH
JUL 17 2017

presumption.  Accordingly, the defendant ● e entitled to that credit.  It must be

deducted from the amount due the plaintiff.

 After hearing testimony and examining the evidence submitted by both sides, I

compute the sum of $165,243.55 due, computed as follows:

| | |
|---|---|
| Principal | $ 129,687.75 |
| Interest (4/1/93 to 1/31/96 - at 11.25%) | 40,951.13 |
| Late charges | 978.72 |
| Escrow taxes | 5,772.63 |
| Appraisal | 75.00 |
| Inspection | 250.85 |
| | $ 177,716.08 |
| Less:  Payments not credited | (12,472.53) |
| Amount due: | $ 165,243.55 |

Dated:  Forest Hills, New York

 April 18, 1996

STEPHAN J. SIEGEL, Referee
109-01 72nd Road - Suite 1A
Forest Hills, New York  11375
(718) 575-3900

# EXHIBIT "3"

The Court's Final Order



ORIGINAL

SUPREME COURT - QUEENS COUNTY
I.A.S. PART 5 ..
--------------------------------
CITIBANK N.A.,
      Plaintiff,

    -against-

KARNEST JOSEPH, et al.,
      Defendants.
--------------------------------

Index No. 24433/93

By:  POSNER, J.

Date: July 3, 1996

Motion Date:
     June 18, 1996

     Plaintiff and defendants Joseph in this foreclosure action move to reject or modify the Referee's Report of Computation dated April 18, 1996 which was rendered after a hearing.

     The motion and cross motion are denied and the Court hereby confirms the Referee's Report dated April 18, 1996. The plaintiff is directed to enter a judgment based upon the aforesaid Referee's Report and to include in the judgment a fee for $1,000.00 to be paid to the Referee in addition to the statutory fee of $200.00.

     Settle judgment of foreclosure and sale.

                                 J.S.C.



Exhibit "B"

# EXHIBITS "4"

The Modification Agreement

REEL 4701 PG 1791       0471-0675Q

Loan No. 2855070

### MODIFICATION AGREEMENT

THIS MODIFICATION AGREEMENT (the "Agreement") is made and entered into as of August 1, 1997, between OCWEN FEDERAL BANK, FSB, a federal savings bank ("Ocwen") and Karnest Joseph and Phenide Joseph ("Borrower" or "you").  The Agreement is as follows:

*Property 114-A 224th Str.* RECITALS

A.   On or about October 12, 1989, Citibank, N.A., the predecessor of Ocwen, loaned you One Hundred Thirty-Two Thousand and 00/100 ($132,000.00) Dollars (the "Loan"), which Loan was evidenced by a note dated October 12, 1989, payable to the order of Citibank, N.A. (the "Original Note").

B.   The Original Note is secured by a Deed of Trust, Mortgage, or Deed to Secure Debt dated October 12, 1989, and recorded among the official records of Queens County, New York, in Book 2895, Page 654,* (the "Original Mortgage"), which Original Mortgage was assigned to Ocwen by Assignment dated as of May 29, 1997 by *Citibank, NA*, recorded in the Office of the Queens County Register on August 21, 1997, in Reel 4656, Page 1719.
*on October 26, 1989

C.   The Original Mortgage grants Ocwen a security interest in the real property owned by you and described in the Original Mortgage (the "Property") and allows Ocwen to enforce remedies, including foreclosure of the Property, upon occurrence of a default, including your failure to make payments as agreed under the Original Note.

D.   Ocwen is now the owner of the Original Note and Original Mortgage (the "Loan Documents") and you agree that the Loan Documents are the only agreements and documents now in effect with respect to the Loan.  Any other understandings, agreements, or arrangements which may have existed pertaining to the Loan are now terminated.

E.   You are now in default under the terms of the Loan Documents and Ocwen is entitled to demand from you, and to collect, payment in full of Two Hundred One Thousand Three Hundred Forty-Four and 00/100 ($201,344.00) Dollars (your "Total Debt").

F.   You have requested that Ocwen refrain from exercising the rights and remedies granted to Ocwen by the Loan Documents and, instead, agree to modify the terms of your obligations under the Loan Documents pursuant to the terms and conditions set forth in this Agreement.

G.   Pursuant to your request to modify your obligations under

*Exhibit "4"*

REEL 4 7 0 1 PG 1 7 9 2

the Loan Documents, and in consideration of the promises, conditions, and terms set forth below, Ocwen has agreed to adjust conditionally the interest rate of the Original Note, the repayment terms of the Original Note, and the total amount due with respect to the Original Note. Ocwen has also agreed to reinstate conditionally the Loan as current and not in default as of the Effective Date, as defined below.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals which you agree to be true and correct and a part of this Agreement, together with such other good and valuable consideration, the receipt and sufficiency of which you and Ocwen acknowledge, you and Ocwen agree as follows:

1.       **Validity of the Loan Documents:** Except as expressly modified by this Agreement, the terms and conditions of the Loan Documents remain in full force and effect and the Original Mortgage shall continue to secure the Original Note and this Agreement.

2.       **The Effective Date:** The effective date of this Agreement shall be as of August 1, 1997(the "Effective Date").

3.       **Modification of Your Obligations:** Your obligations under the Loan Documents are conditionally modified as follows:

a.   **New Monthly Payment:** Your new total monthly payment amount, which includes your principal, interest, and escrow payments, as discussed below, and which may be adjusted from time to time as your escrow payment changes, will initially be One Thousand Three Hundred Seventy-Four and 61/100 ($1,374.61) ("New Monthly Payment").

b.   **Payment Term:** Your first New Monthly Payment will be due on September 1, 1997, with all of your subsequent New Monthly Payments due on the first day of each month following this date and continuing for thirty (30) years until July 1, 2027 (the "New Maturity Date") when your remaining New Principal Balance, as defined below, including any additional interest, charges, advances, and other fees and costs related to the Loan which Ocwen has not yet collected, will be due.

c.   **Late Charges:** In the event your New Monthly Payment has not been received by Ocwen within ten (10) days of the first day of the month when such New Monthly Payment

2

REEL 4 7 0 1 PG 1 7 9 3

is due, you agree to pay a late charge of five percent (5%) of the total New Monthly Payment due.

d.   **New Principal Balance:**   The new principal balance you now owe with respect to the Loan is One Hundred Twenty-Nine Thousand Six Hundred Eighty-Eight and 00/100 ($129,688.00) Dollars (the "New Principal Balance").

e.   **Interest Rate:**   From the Effective Date of this Agreement, you will owe interest on the unpaid New Principal Balance at an annual rate equal to eleven and one-eighth percent (11.125%).

f.   **Principal and Interest Payments:**   Your New Monthly Payment will include a monthly payment of principal and interest in the amount of One Thousand Two Hundred Forty-Seven and 31/100 ($1,247.31) Dollars.

g.   **Escrow Payments:**   As further described below, your New Monthly Payment will also include an initial monthly escrow payment, in the amount of One Hundred Twenty-Seven and 30/00 ($127.30) Dollars.

h.   **Deposit:** Upon the execution hereof by you, you shall remit to Ocwen the sum of Fifty Thousand and 00/100 ($50,000.00) Dollars (the "Deposit") in addition to the first payment due hereunder.   The Deposit and monthly payment shall be delivered to Ocwen via wire transfer to:

> Ocwen Federal Bank, FSB
> Fort Lee, New Jersey
> Attention: Christopher Van Dort
> ABA# 221271113
> re: Loan # 2855070

4.   **Right to Prepay:**   You have the right to prepay the Loan at any time, in whole or in part, without penalty or premium.

5.   **Escrow Account:**   Subject to applicable law, Ocwen shall maintain an escrow account (the "Escrow Account") to which you shall pay to Ocwen on the day monthly payments are due a sum for yearly taxes and assessments; yearly hazard, property or flood insurance premiums; and other costs necessary to preserve Ocwen's security interest in the Property ("Escrow Costs").   The amount of your monthly payment to the escrow account will equal 1/12 of Ocwen's estimate of the annual Escrow Costs and may change from time to time as Escrow Costs change. Your Escrow Account balance is, as of the Effective Date,

3

REEL 4701 PG 1794

One Thousand Four Hundred Eleven and 90/100 ($1,411.90) Dollars.

In accordance with federal law (RESPA), Ocwen may hold a reserve in an amount not to exceed 1/6th of the total annual projected Escrow Costs, unless the mortgage documents or state law specifies a lower amount. Annually, it will be Ocwen's responsibility to analyze the Escrow Account.  If the Funds held by Ocwen exceed the amounts permitted to be held by applicable law, Ocwen shall account to you for the excess Funds in accordance with the requirements of applicable law.  If the amount of the Funds held by Ocwen are not sufficient to pay the Escrow Costs when due,  Ocwen may notify you in writing, and, in such case, you shall pay to Ocwen the amount necessary to make up the deficiency.  You shall make up the deficiency in no more than twelve (12)  monthly payments.

6.       **Insurance Requirements:**  As a condition of this Agreement, you shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire and other hazards, including floods or flooding, in an amount not less than the New Principal Balance. The insurance carrier providing the insurance shall be chosen by you subject to Ocwen's approval which shall not be unreasonably withheld.   All insurance policies and renewals shall reference Ocwen's loan number and include a standard mortgagee clause for the benefit of:

> Ocwen Federal Bank, FSB
> Its Successors and/or Assigns
> The Forum, Suite 409
> 1675 Palm Beach Lakes Blvd.
> West Palm Beach, FL 33401

7.       **Completion of this Agreement:**  If you fully comply with all of the terms and provisions of this Agreement and the terms and provisions of the Loan Documents and pay the New Principal Balance in full with accrued interest on or before the New Maturity Date, Ocwen will discharge your obligations under the Loan Documents and this Agreement.  Moreover, for as long as you fully comply with the terms and provisions of the Loan Documents and this Agreement, Ocwen will, until the New Maturity Date, conditionally reinstate your Loan as current and shall not exercise any of its collection rights or remedies against you which are permitted under the Loan Documents, this Agreement or at law or in equity.

4

REEL 4701 PG1795

8.      **Additional Events of Default:** Without limiting the other events of default set forth in the Loan Documents, you will be in default under this Agreement and under the Loan Documents upon the occurrence of any one or more of these events:

a.      If any bankruptcy or insolvency proceeding is filed by or against you.

b.      Any representation or warranty made by you in the Loan Documents, this Agreement, or any initial agreement proves to be false or misleading in any respect.

c.      You fail to make the New Monthly Payments as required by this Agreement.

d.      You fail to make a lump sum payment to cover Escrow Charges when requested by Ocwen.

e.      You sell or convey any interest in the Property without Ocwen's prior written consent.

f.      Breach of any of the terms or provisions of this Agreement.

9.      **Consequences of Your Default:** If you default under this Agreement or the Loan Documents after the Effective Date (your "Default") Ocwen may, in addition to the remedies provided by the Loan Documents, terminate this Agreement and, subject only to applicable law, institute or resume any foreclosure or collection proceedings without prejudice for having accepted any payments, including but not limited to the New Monthly Payments, under this Agreement and exercise any of its rights and remedies against you under the Loan Documents and/or this Agreement.  Moreover, upon your Default, Ocwen may, at its option, accelerate the entire Total Debt due under the Original Note, accrued interest thereon, and any other costs or advances; and elect to account for and apply all payments, including but not limited to the New Monthly Payments, you may have made from the Effective Date until the time of your Default pursuant to the terms of the Original Note.

10.     **Your Representations and Warranties:** As a material condition to Ocwen's willingness to enter into this Agreement, you represent and warrant the following facts:

a.      You represent and warrant that you are indebted to Ocwen pursuant to the terms of the Loan Documents and this Agreement, that your Total Debt is accurately set

5

REEL 4 7 0 1 PG 1 7 9 6

forth in this Agreement, and that you have no claims, actions, causes of action, statute of limitations or other defenses, counterclaims, or setoffs of any kind which you can assert against Ocwen in connection with the making, closing, administration, collection, or enforcement by Ocwen of the Loan Documents, this Agreement, or any related agreement.

b.   You represent and warrant that you have no intention to file or agree to any bankruptcy proceeding at any time after the Effective Date and that you believe the terms of this Agreement are sufficient to allow you to comply with your obligations under the Loan Documents and this Agreement.   In the event that you are to become the subject of a bankruptcy  proceeding, you consent to relief from any automatic stay which may be imposed and which would, otherwise, prevent Ocwen from proceeding with foreclosure in the event you are in Default pursuant to the Loan Documents and/or this Agreement.

c.   You represent and warrant that all statements you have made to Ocwen, whether written or oral, all financial information and releases you have provided to Ocwen regarding you or the Property, and all information provided pursuant to any initial agreement you  may have signed with Ocwen, remain valid and were true as of the date made and as of the Effective Date.

d.   You represent and warrant that you understand that this Agreement is legally binding and that it affects your rights.   You have obtained, or have had the opportunity to obtain, independent legal counsel concerning the meaning and importance of this Agreement. You further represent and warrant that you are signing this Agreement voluntarily and with full understanding of its contents and meaning.

11.   Your Release of Ocwen:  IN THE EVENT THAT YOU HAVE ANY CLAIMS, ACTIONS OR CAUSES OF ACTION, STATUTE OF LIMITATIONS OR OTHER DEFENSES, COUNTERCLAIMS OR SETOFFS OF ANY KIND WHICH YOU  NOW OR HEREAFTER MAY ASSERT AGAINST OCWEN IN CONNECTION WITH THE MAKING, CLOSING, ADMINISTRATION, COLLECTION OR THE ENFORCEMENT BY OCWEN OF THE LOAN DOCUMENTS, THIS AGREEMENT OR ANY OTHER RELATED AGREEMENTS, THEN BY EXECUTING THIS AGREEMENT YOU FOREVER IRREVOCABLY WAIVE AND RELINQUISH THEM.  THE TERM 'OCWEN' SHALL INCLUDE FOR THE PURPOSES OF THIS AGREEMENT, BUT SHALL NOT BE LIMITED TO, OCWEN'S PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS AND ALL PRIOR AND SUBSEQUENT PARTIES IN INTEREST, INCLUDING BUT NOT LIMITED TO OCWEN'S PREDECESSOR(S) IN INTEREST.

6

REEL 4701 PG 1797

12.    **Final Agreement:**   This Agreement may not be supplemented, changed, waived, discharged, eliminated, modified or omitted except by written document executed by both you and Ocwen.   This Agreement constitutes the entire agreement between you and Ocwen, supersedes all previous negotiations and discussions between you, Ocwen and/or Ocwen's predecessors in interest, and neither parole evidence nor any prior or other agreement shall be permitted to contradict or vary its terms.   There are no promises, terms, conditions, or obligations other than those contained in this Agreement.

13.    **No Waiver:**  By executing this Agreement, Ocwen is not waiving and shall not be deemed to have waived any of your defaults under the Loan Documents nor any of Ocwen's rights or remedies against you.  Moreover, any waiver by Ocwen of any breach or any provision of this Agreement or the Loan Documents or any related agreement or its failure to exercise any right or remedy under this Agreement, the Loan Documents or any related agreement shall not be deemed a continuing waiver or a waiver of any other subsequent breach, whether of the same or any other provision, and shall not in any way impair any of Ocwen's rights or remedies.

14.    **No Novation:**   You expressly agree that this Agreement is not a new loan from Ocwen but simply the modification of your existing obligations under the Loan Documents.  Neither you nor Ocwen have any intention to extinguish or discharge the indebtedness or the liens evidenced by the Loan Documents.

15.    **Choice of Law and Severability:**  This Agreement shall be governed by and construed under the laws of the State where the Property is located.  If any portion, term or provision of this Agreement is held by a court of competent jurisdiction to be illegal or in conflict with such law, the validity of the remaining portions, terms or provisions of this Agreement shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if this Agreement did not conflict with such law and/or did not contain the portion, term or provision held to be invalid.

16.    **Successors:** This Agreement shall bind the parties' respective successors, assigns, heirs and personal representatives.  This Agreement shall not be understood to limit in any way the right of Ocwen to sell, or otherwise convey, any interest in the subject obligation to another, provided that such subsequent party in

7

REEL 4701 PG 1798

interest is also bound as Ocwen to the terms of this Agreement.

17.     **References:** All references to the singular shall include the plural and all references to one gender herein shall include both genders.

18.     **Executed in Counterparts:** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

19.     **No Trial By Jury:** BY EXECUTING THIS AGREEMENT, YOU IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY RELATED AGREEMENTS OR DOCUMENTS OR TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

20.     **Payment Instructions:** All payments, unless you are notified by Ocwen in writing of a different address, shall be made to Ocwen at the following address:

        Ocwen Federal Bank, FSB
        c/o FISERV
        P.O. Box 16071
        New Brunswick, NJ  08906-6071

21.     **Notices:** All notices should be sent to:

        If to Ocwen:

        Ocwen Federal Bank, FSB
        Attn: Katie Sovic, Esq.
        1675 Palm Beach Lakes Blvd., Suite 402
        West Palm Beach, FL  33401
        Telephone:  561/681-8796
        Fax:        561/681-8162

        If to Borrower:

        Karnest & Phenide Joseph
        114-74 224th Street
        Cambria Heights, NY 11411

22.     **Time of the Essence:** Time, and Ocwen's unimpaired security interest in the Property, shall be of the essence as to your obligations under this Agreement.

8

REEL 4 7 0 1 PG 1 7 9 9

WITNESS the following signatures and seals as of the day first written above.

KARNEST JOSEPH

PHENIDE JOSEPH

OCWEN FEDERAL BANK, FSB

By:

**TRINI L. DONATO**
Director, Default Servicing

STATE OF NEW YORK
COUNTY OF *Nassau* :ss:

On this 27 day of August, 1997, before me personally came KARNEST JOSEPH and PHENIDE JOSEPH, to me known to be the individuals described in and who executed the foregoing instrument, and acknowledged to me that the executed the same.

_____
Notary Public

HARRIET SAYETTA
NOTARY PUBLIC, State of New York
No. 4786725
Qualified in Nassau County
Commission Expires January 31, 1998

STATE OF FLORIDA
COUNTY OF PALM BEACH :ss.:

On the 27th day of August, 1997, before me came Trini L Donato to me known ,who, being by me duly sworn, did depose and say that he resides at 1665 Palm Beach Blvd that she is the Director Default Servicing Ocwen Federal Bank, FSB, the corporation described in and which executed the foregoing instrument, that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; that he signed his name thereto by like order.



_____
Notary Public

CATHI BARNETT
My Commission # CC556508
Expires May 21, 2000

9

# EXHIBIT "5"

The Defendant(s) November 10, 2017-Letter



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ®

PO Box 785061
Orlando FL  32878-5061
Toll Free: (800) 390-4656

O C W E N

November 10, 2017

Account Number: 2855070
Ocwen's Case Number: 14951962

New York State Department of Financial Services
Mortgage Assistance Unit
B Filip
One State Street Plaza
New York NY  10004

Customer(s):       Karnest Joseph
                   Phenide Joseph
                   Ramino Olivier
Property Address:  114-74 224th Street
                   Cambria Hts NY  11411-1226
Case Number:       BKM-2017-1224049

Dear B. Filip:

Thank you for contacting the Office of the Consumer Ombudsman.  This letter is in response to your communications dated October 5, 2017 and November 3, 2017, on behalf of the authorized third party, Mr. George Joseph regarding the account held by Karnest Joseph, Phenide Joseph, and Ramino Olivier.  We appreciate the information provided and welcome the opportunity to review the concerns raised.

Based on the information provided, Mr. Joseph raised concerns regarding a $12,000.00 credit by the prior servicer pursuant to a court order dated April 18, 1996 and the application of $50,000.00 paid to Ocwen in 1997, and the unpaid principal balance since February 2017.  I have been assigned to thoroughly review these concerns and my findings are outlined below.

Records indicate we responded to the concerns raised by Mr. Joseph, in our letters dated February 7, 2017, April 5, 2017, August 7, 2017, and September 20, 2017.  Enclosed are copies of the letters for your reference.  A Payoff Quote dated August 7, 2017, was sent to Mr. Joseph's attention, indicating the total amount to payoff the account with a good through date of September 5, 2017.  Enclosed is a copy of the Payoff Quote for your reference.  Please be advised, balances may increase due to interest and fees.

We acquired the servicing rights of the account from Citibank, N. A. (Citibank) in July 1997.  Our response is therefore based upon the available account records acquired from Citibank as well as account records maintained by us.  Enclosed please find the available payment histories.

We have enclosed a copy of the court document that was provided to us and below is a breakdown, for your reference.

| | |
|---|---|
| Principal Balance | $129,687.75 |
| Interest (4/1/93 to 1/31/96) | $40,951.13 |
| Late Charges | $978.72 |
| Escrow Taxes | $5,722.63 |
| Appraisal | $75.00 |
| Inspection | $250.85 |
| **Total** | **$177,716.08** |
| **Less Payments not Credited** | **$12,472.53** |
| **Amount Due** | **$165,243.55** |

NMLS # 1852                                                                 NC Permit # 3946

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in an active bankruptcy case or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Exhibit "C"



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ®

PO Box 785061
Orlando FL  32878-5061
Toll Free: (800) 390-4656

Please be advised, interest is paid in arrears. The delinquent interest was reflecting due for April 1, 1993 to January 31, 1996; therefore, the amount included the delinquent monthly payments from May 1, 1993 through February 1, 1996. At the time of acquisition, the account reflected due for the December 1, 1994 payment and an unpaid principal balance of $129,687.75. Based on the available documents, the due date may have been advanced from May 1, 1993 to December 1, 1994, which would have reduced the delinquent interest owed by 19 months (April 1, 1993 through October 31, 1994). As a result, the unpaid principal balance remained the same of $129,687.75. If payments were made for May 1, 1993 through November 1, 1994 and were not properly applied to the principal and interest payment, please provide us with documentation such as a legible copy of the front and back of the cashed checks or money orders, bank statement reflecting full details of the cashed payments or a source of receipt (if payment was wired), so that we may research the matter further. Please send this information to address below.

However, in August 1997, we offered a loan modification which required a down payment in the amount of $50,000.00, a new unpaid principal balance of $129,688.00 and a maturity date of July 1, 2027. The first modified payment was effective September 1, 1997 payment, in the amount of $1,374.61, of which $1,247.31 was for principal and interest payment and $127.30 was for the escrow account. The monthly payment may adjust periodically due to the change of the escrow payment. This is outlined in section 5 of the enclosed Modification Agreement, which was presented to the Josephs by our counsel.

The total capitalized amount of $2,582.42 was applied on August 29, 1997, which brought the new unpaid principal balance to $129,688.00 ($127,105.58 + $2,582.42). Of the capitalized amount, $2,487.17 was applied to the escrow account to bring the escrow account balance to a positive amount of $1,411.90 (-$1,075.27 + $2,487.17) and to ensure the escrow balance had sufficient funds for the upcoming escrow year. The remaining capitalized amount of $95.25 were fees ($2,487.17 + $95.25 = $2,582.42). The interest rate remained the same at 11.125%. Per the agreement, Recitals Section E., the account was in default the amount of $201,344.00. The default amount included the unpaid principal balance, the delinquent interest, the negative escrow balance, late charges and fees and costs. Due to the age of the account, we are unable to provide a breakdown of the default amount.

 On August 27, 1997, we receive funds in the amount of $50,000.00, of which $49,302.00 ($1,494.00 * 33) was applied to satisfy the December 1, 1994 through August 1, 1997 payments. The remaining amount of $698.00 ($50,000.00 - $49,302.00) was applied towards a suspense account. A suspense account is utilized until sufficient funds are received to post the next scheduled payment in full or pending the next transaction. The payments reduced the unpaid principal balance from $129,687.75 to $127,105.58 and a negative escrow balance from -$8,481.79 to -$1,075.27. Enclosed is a copy of the Payment Reconciliation History (PRH) for your reference. 

 We received the signed Modification Agreement from our counsel on August 29, 1997. Thus, the Josephs agreed to the terms outlined in the loan modification. The account was adjusted according to the Modification Agreement. We also received a check in the amount of $2,786.51, of which $1,374.61 was applied to satisfy the first modified payment of September 1, 1997 and the remaining $1,411.90 was applied to the escrow account. This payment brought the unpaid principal balance to $129,643.01 and the escrow balance to $2,951.10.

 On September 17, 1997, we received funds in the amount of $1,374.60, these were combined with the funds in already in the suspense account of $698.00, the total amount was $2,072.60, of which $1,374.61 was applied to satisfy the October 1, 1997 payment and the remaining $697.99 was applied to the unpaid principal balance. Please be advised, the $698.00 in the suspense account were funds from the $50,000.00 we received as a down payment for the loan modification.

Records indicate the account entered into a forbearance plan in April 2005, which required a down payment in the amount of $50,000.00 and monthly payments of $1,500.00 effective June 1, 2005 through April 1, 2006. We received funds in the amount of $50,000.00 on April 21, 2005, which were placed in the suspense account. In combination with the prior suspense balance of $18.52, the funds brought the suspense balance to a total of $50,018.52. The funds in the amount of $48,902.20 ($1,438.30 * 34) were applied to satisfy the June 1, 2001 through March 1, 2004 payments, which left funds in the amount of $1,116.32 in the suspense account.

NMLS # 1852                                                                                          NC Permit # 3946
*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in an active bankruptcy case or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ®

PO Box 785061
Orlando FL 32878-5061
Toll Free: (800) 390-4656

With regard to the late charges, a grace period of 10 days is provided each month. If the complete payment is not received prior to the grace period ending, a late charge rate of 5% will be assessed to the account, per the loan modification terms. Please refer to Section 3c Late Charges for your reference. On April 15, 2006, the late charge was inadvertently changed from 5% back to 2% with a grace period of 16 days, per the terms of the original Fixed (3-Day Rate) Note (Note). Enclosed is a copy of the Note for your reference.

We received another inquiry regarding the late charges in July 2014. The agent reviewing the file requested to have the late charges in the amount of $1,796.16 waived as the account was charged 48 times in the amount of $62.38 from December 2000 to April 2006, while the late charge reflected 5% and not 2%. The late charge waiver of $1,796.16 was completed on July 16, 2014. Please refer to the enclosed PRH for the late waiver.

The late charge rate was adjusted again on December 26, 2016, to reflect 5% and extended the grace period to 15 days per the terms of the loan modification. We received another inquiry in January 2017 regarding the late charges. Another adjustment was completed on January 11, 2017, to reflect the late charge rate of 2% and 15 days grace period per the terms of the original Note. Another request was made to waive late charges of $1,796.16, which was previously waived in July 2014. However, funds in the amount of $434.92 were already applied to some of the late charges. As a result, the funds of $434.92 were reversed and refunded to the suspense account, which was completed February 3, 2017. The remaining amount of $1,361.24 ($1,796.16 - $434.92) was requested to be waived from the remaining outstanding late charges. However, we inadvertently waived a total amount of $1,796.16 on February 3, 2017, resulting with a credit reflecting on the PRH for late charges. We will continue to monitor the account to ensure the PRH reflects the correct total late charges. As of February 4, 2017, the total late charges were at a zero balance.

Below is chart reflecting the late charge assessment, paid, and waived (if applicable) since February 4, 2017, resulting in the final outstanding late charges.

| Late Charge Assessed | Late Charge Amount | Paid Amount | Paid Date | Waived Amount | Waived Date | Total Amount |
|---|---|---|---|---|---|---|
| 3/16/2017 | $24.95 | | | | | $24.95 |
| 4/17/2017 | $24.95 | | | | | $49.90 |
| 5/16/2017 | $24.95 | $14.90 | 5/31/2017 | $24.95 | 6/6/2017 | $35.00 |
| 6/16/2017 | $24.95 | $24.95 | 6/30/2017 | | | $35.00 |
| 7/17/2017 | $24.95 | $24.95 | 7/31/2017 | | | $35.00 |
| 8/16/2017 | $24.95 | $24.95 | 8/31/2017 | | | $35.00 |
| 9/18/2017 | $24.95 | $24.95 | 9/29/2017 | | | $35.00 |
| 10/16/2017 | $24.95 | $24.95 | 10/31/2017 | | | $35.00 |

Pursuant to Mr. Joseph's request, a late charge of $24.95 was waived as a courtesy. Although, the account is currently reflecting a late charge rate of 2% and 15 days grace period, we have not adjusted the account to the terms the Modification Agreement. However, we are unable to guarantee if the late charge rate will be adjusted in the future to 5%, which would be correct based on the Modification Agreement.

Please be advised, the amortization schedules Mr. Joseph provided would not accurately reflect the account payment history of the account. The first payment due on the account was December 1, 1989 with a beginning unpaid principal balance of $132,000.00 and the account has been delinquent on a few occasions. Therefore, the amount applied to the principal and interest payments may differ based on when the contractual payments were received. In addition, the adjustment to the due date while the account was with the prior servicer, which affected the interest owed but not total unpaid principal balance. Further, the 1997 amortization schedule Mr. Joseph provided, effective September 1997 is not accurate, as the interest rated used for the calculation was 11.130% and the interest rate is 11.125% and the account fell behind in 2001.

As of the date of this letter, the account is due for the November 1, 2017 payment, late charges in the amount of $35.00, an

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in an active bankruptcy case or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ®

PO Box 785061
Orlando FL  32878-5061
Toll Free: (800) 390-4656

escrow balance of negative $1,928.85, and an unpaid principal balance of $82,218.99.  Please be advised the unpaid principal balance is not a payoff amount of the account.  We have enclosed a copy of the most recent Payoff Quote dated November 2, 2017.  Please be advised, balances may increase due to interest and fees.

Thank you for bringing the concerns to our attention.  We have investigated the allegations we did not provide Mr. Joseph with the Payoff Quote since February 2017 and concerns regarding the application of payments of $50,000.00 and found no evidence that an error was made by Ocwen.  We provided documentation regarding the $12,000.00 in question by the prior servicer.  I have enclosed the documentation we relied upon to review your concern. If you believe there is additional documentation relevant to your issue, which was not provided, you may request such documents by contacting me at the address below, directly at (469) 645-5026 or at the Ombudsman Office via fax (866) 771-5152.

Phetsany Khamdaranikorn, Office of the Consumer Ombudsman
P O Box 785061
Orlando FL  32878-5061

Thank you for allowing us to assist you.  Ocwen's mission is to help homeowners and we hope this response addressed Mr. Joseph's concerns regarding the account.  If you have further questions regarding this response, please contact me directly at (469) 645-5026, or our Ombudsman team at (800) 390-4656, Monday through Friday from 9:00 am to 6:00 pm ET.

Mr. Joseph may also contact Ocwen's Customer Care Center at (800) 746-2936 for additional information regarding the account. We are available Monday through Friday 8:00 am to 9:00 pm and Saturday 8:00 am to 5:00 pm ET.

Sincerely,

*Phetsany Khamdaranikorn*

Phetsany Khamdaranikorn
Consumer Account Analyst
Office of the Consumer Ombudsman

Enclosures

cc:    Karnest Joseph
       3 Sunset Dr
       Bellport NY  11713

       Phenide Joseph
       Ramino Olivier
       114-74 224th Street
       Cambria Heights NY  11411-1226

       George Joseph
       114-74 224th Street
       Cambria Heights NY  11411-1226

       B Filip
       Submitted Electronically

NMLS # 1852                                                      NC Permit # 3946
*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in an active bankruptcy case or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

# EXHIBITS "6"

The Ocwen Federal Bank, FSB's Forbearance Agreement

APR-19-2005  18:03                                                                P. 02/06

# OCWEN FEDERAL BANK FSB
### FORBEARANCE AGREEMENT

04/19/2005

Karnest Joseph
Phenide Joseph
114-74 224th St
Jamaica, NY 11411

Re:    Loan#:      2855070
       Property Address: 114-74 224th Street #priva, Cambria Hts, NY 11411
       Customer(s):     Karnest Joseph
                        Phenide Joseph

The Borrower(s), Karnest Joseph and Phenide Joseph ("Borrower") and Ocwen Federal Bank FSB ("Ocwen")
acknowledge and agree as follows:

## ACKNOWLEDGMENTS

A.  On 8/1/1997 Borrower executed a promissory note (the "Note") in the amount of $129,688.00. The Note
    evidences a Loan (the "Loan") to Borrower in the amount of the Note.

B.  In order to secure obligations under the Note, Borrower executed a Mortgage/Deed of Trust (the "Mortgage"),
    which encumbers the property at the address referenced above (the "Property").

C.  Borrower has defaulted on the Note and the Mortgage. As of 4/18/2005, the amount due under the terms of the
    Note is $76,322.43 ("Default"), and the current contractual due date is 6/1/2001.

D.  Borrower has requested Ocwen and Ocwen has agreed to temporarily forbear enforcement of its rights under the
    Note and the Mortgage pursuant to the terms of this Forbearance Agreement (the "Agreement").

E.  The purpose of this Agreement is to enable Borrower to reduce the delinquency on the Borrower's obligations
    under the terms of the Note and Mortgage.

F.  In consideration of the mutual benefits derived from the Agreement and for other good and valuable
    consideration, the sufficiency and receipt of which is hereby acknowledged, Borrower and Ocwen agree as
    follows:

## AGREEMENTS

1.  **RECITALS**
    The above Acknowledgments are true and correct and are incorporated herein by reference.

2.  **PAYMENTS**
    Borrower shall make payments to Ocwen as detailed in this section of the Agreement. All payments must be
    made payable to Ocwen Federal Bank FSB and must clearly reference the Loan Number above.

    A.  **DOWN PAYMENT**
        1.  A down payment in the amount of $50,000.00 shall be made.
        2.  Ocwen must receive the down payment on or before 5:00pm EST on 4/20/2005

Loan#: 2855070                                                  Borrower Initials :
04/19/05:2:55 PM                                                     Page 1

*Exhibits "6"*

3. The down payment must be in certified funds, via Western Union, or a money order payable to Ocwen Federal Bank FSB.

4. Borrower must send the payment by one of the following methods:

| | |
|---|---|
| **OVERNIGHT DELIVERY**<br>OCWEN FEDERAL BANK FSB<br>12650 INGENUITY DRIVE<br>ORLANDO, FL 32826 | **WESTERN UNION QUICK COLLECT**<br>CODE CITY: "OCWEN"<br>STATE: "FLORIDA"<br>REFERENCE: YOUR LOAN NUMBER<br>AGENT LOCATER: (800) 325-6000 |
| **MONEYGRAM**<br>RECEIVER CODE: 3237<br>PAYABLE TO: OCWEN FEDERAL BANK FSB<br>CITY: ORLANDO<br>STATE: FLORIDA<br>REFERENCE: YOUR LOAN NUMBER<br>AGENT LOCATER: (800) 926-9400 | **BANK WIRE**<br>WIRE TO: OCWEN FEDERAL BANK FSB<br>ABA#: 221271113<br>ADDRESS: 2400 LEMOINE AVE. FORT LEE, NJ 07024<br>REFERENCE: YOUR LOAN NUMBER |

**B.  INCREASED MONTHLY PAYMENTS**

1. Beginning on 6/1/2005 and continuing on the 1st day of each and every month through (and including) 4/1/2006 (the "Termination Date") increased monthly payments in the amount of $1,500.00 shall be made.

2. The monthly payment shall include the normal monthly payment plus additional sums necessary to reduce the amount of the delinquency under the terms of the Note by the Termination Date as determined by Ocwen.

3. Borrower must send all increased monthly payments to:

OCWEN FEDERAL BANK FSB
P.O. BOX 514577
LOS ANGELES, CA 90051-4577

**C.  PAYMENT RULES**

1. It is the Borrower's responsibility to timely and fully make all payments required by the Agreement and to ensure that such payments are received at the places and no later than the time period specified herein. Failure to adhere to this rule will be considered a material breach of the Agreement.

2. Ocwen may reject any payment that is not in the full amount as specified in this Agreement.

**2.  PENDING FORECLOSURE ACTION**

If a foreclosure action is pending as of the date of this Agreement, then Ocwen will use its best efforts to put the foreclosure action on hold provided that the Borrower satisfies it obligations hereunder. OCWEN SHALL NOT BE LEGALLY REQUIRED TO STOP ANY FORECLOSURE UNLESS AND UNTIL OCWEN HAS RECEIVED BOTH THE EXECUTED AGREEMENT AND CERTIFIED FUNDS FOR THE DOWN PAYMENT. Borrower understands that foreclosure actions put on hold are not actually dismissed. In the event of any material breach or default under the Agreement, Ocwen may resume any pending foreclosure.

**3.  CONTINUING OBLIGATIONS UNDER THE NOTE AND MORTGAGE**

During the term of the Agreement, Borrower must continue to timely perform all Borrower's obligations under the Note and Mortgage, including but not limited to payment of taxes and insurance premiums as provided in the Note and Mortgage, and to comply with all laws that affect the Property. All of Borrower's obligations under the Note and Mortgage remain in full force and effect except as expressly modified by the Agreement. Nothing in this Agreement shall affect or impair Ocwen's rights or powers under the Note and Mortgage to recover any sum due, together with interest and costs.

Loan#: 2855070
04/19/05:2:55 PM

Borrower Initials : PJ
Page 2

**4. ADDITIONAL SUMS DUE ON TERMINATION DATE**

On or before the Termination Date, and in order to fully reinstate the Loan, Borrower shall pay the following additional sums to Ocwen:

A. Late charges that continue to accrue, as provided in the Note, until the Loan is current.

B. Any sums Ocwen has advanced that the Borrower is required to reimburse under the terms of the Note and Mortgage including, but not limited to, advances for insurance, appraisals, taxes, legal and foreclosure expenses.

**5. CREDIT REPORTING**

Borrower will remain in Default during the term of the Agreement, and Ocwen will continue to report this fact to the credit reporting agencies until the Borrower is contractually current with the Loan.

**6. MONTHLY STATEMENTS**

Borrower will continue to receive monthly statements on the Loan during the term of the Agreement; however, failure to receive a monthly statement DOES NOT relieve Borrower of any obligation under the Agreement. Should any discrepancy occur between a billing statement received by Borrower and the Agreement, the provisions of the Agreement will govern.

**7. TAXES AND HAZARD INSURANCE**

As additional consideration for this Agreement and upon the request of Ocwen, Borrower with non-impounded accounts shall deposit with Ocwen in monthly installments an amount equal to one-twelfth (1/12) of the estimated aggregate annual real estate taxes and/or insurance premiums on all policies of Insurance required under the Note and Mortgage. If at any time and for any reason the funds deposited with Ocwen are or will be insufficient to pay such amount as may be then or subsequently due, Ocwen may notify Borrower and Borrower shall immediately deposit an amount equal to such deficiency with Ocwen. Regardless of any decrease in tax or insurance requirements, the Agreement payments will not decrease. Any such surplus shall be applied against the Loan delinquency.

**8. ADJUSTABLE RATE NOTE**

If the terms of the Note provide that it is an adjustable rate instrument, the monthly payments due under the Agreement are subject to change based upon fluctuations in the Index rate. If there is an increase in the Index, Ocwen will increase the monthly payment required under the Agreement accordingly; however, if there is a decrease in the Index, Ocwen will not decrease the monthly payment under the Agreement and such surplus shall be applied against the Loan delinquency.

**9. PREPAYMENTS**

If all payments past due under the terms of the Note and Mortgage are paid prior to completion of the obligations under the Agreement, the Agreement shall terminate and the monthly payments and obligations required by the original Note and Mortgage will resume. The amount of the monthly payment may be different from the original payment due to changes in escrow requirements.

**10. DELINQUENCY AT TERMINATION**

If all payments under the terms of the Agreement have been made in a timely manner, Ocwen may, in its sole discretion, extend the Agreement for additional terms to further reduce any remaining delinquency.

**11. TERMINATION CONDITIONS**

The Agreement will automatically terminate upon default under any term of the Agreement or discovery that the information provided by Borrower in connection with securing this Agreement was incorrect. If termination results from one of the aforementioned conditions, the Borrower will be subject to the terms of the Note and Mortgage unless otherwise agreed by the parties. If the payments are still past due at that time, Ocwen shall be entitled to commence or resume foreclosure without further notice.

**12. PREVIOUS DISCHARGE IN BANKRUPTCY**

Loan#: 2855070
04/19/05:2:55 PM

Borrower Initials :
Page 3

In the event that the underlying debt has been discharged as a result of a prior bankruptcy proceeding, Ocwen hereby acknowledges that it is not attempting to assess personal liability for the Loan to the Borrower by entering into this Agreement. In such circumstances, Ocwen's recourse in collection matters shall be limited to the collateral described in the security instrument.

### 13. NON WAIVER

Any failure by Ocwen to insist on strict performance of any provision of this Agreement does not constitute a waiver of such provision or any other provision of this Agreement.

### 14. BORROWER RELEASE OF OCWEN

As consideration, the Borrower hereby releases Ocwen from any and all claims known or unknown that Borrower has against Ocwen, which in any way arise from or relate to the Note, the Mortgage, the Loan, or the Default. Borrower also specifically waives any right under any statute providing that a release does not extend to claims that the releasor did not know, did not have reason to know, and did not suspect to exist in his favor at the time of executing the release, which, if known by him, would materially affect his settlement with the releasee. In the event Borrower has filed any affirmative defenses and/or counterclaim to any pending foreclosure filed by Ocwen or by the holder of the Loan, Borrower does hereby withdraw same with prejudice, and does hereby specifically authorize this Agreement to be filed with the court, and waives any objections to the dismissal of such defenses or claims with prejudice.

### 15. ENTIRE AGREEMENT

There are no other agreements between Ocwen and Borrower other than the express agreements contained in the Agreement, the Note and the Mortgage. The Agreement supercedes all negotiations and other agreements between Ocwen and Borrower other than those set forth in the Note and the Mortgage.

### 16. AMENDMENT

The Agreement can only be amended in writing signed by the parties hereto or their authorized representatives. Borrower waives any right to assert at any time that Ocwen orally agreed to amend the terms of the Agreement in return for payment of any sum or other act by Borrower.

### 17. ATTORNEY FEES AND COSTS

Borrower shall, upon demand, promptly repay Ocwen any reasonable and necessary attorney fees and costs incurred by Ocwen to enforce its rights under the Agreement or to defend against any claim of any kind arising from or related to the Agreement. Any such fees and costs shall become an additional obligation under the Note and Mortgage.

APR-19-2005  18:05                                                                P.05/06

## 18. SIGNATURES:

By signing below, Borrower acknowledges that Borrower has had sufficient time to read, review and consider the terms of the Agreement. In addition, Borrower has been given reasonable opportunity to consult with counsel regarding the terms of this Agreement before signing below.

Borrower: Karnest Joseph                          Borrower: Phenide Joseph

_____   _____          _____   4/19/05
Signature                 Date            Signature                  Date

STATE OF  _New York_  )

COUNTY OF  _Nassau_  )

The foregoing instrument was executed and acknowledged before me this 19th day of _April_, 2005 by _Karnest Joseph and Phenide Joseph_ who is (are) personally known to me or has (have) produced _N.Y.S. Ben. Ft. I.D. Card # JV1348846_ as identification.

_____
Notary Public Signature
Commission Expires: _____

SEAL

**EDEN DAMOUR**
Notary Public, State of New York
No. 01DA5031027
Qualified in Queens & Nassau Counties
Commission Expires Sept. 9, 2006

Ocwen Federal Bank FSB:

_____   _____
Signature and Title              Date



# EXHIBITS "7"

Plaintiffs' April 12, 2018-Letter

Page 1 of 4

April 12, 2018

From: Mr. George Joseph
      3 Sunset Drive
      Bellport, NY 11713

To:   Phetsamy Khamdaranikorn, Consumer
      Account Analyst, Office of the Consumer
      Ombudsman, 1661 Worthington Road,
      Ste.100 West Palm Beach, FL ~~33479~~ 33418 - 4736

To:   Bonnie Filip, New York Department of Financial
      Services, One State Street, New
      York, NY 10004-1511

Re:   Loan No.: 2855070
      DFS's Case No.: BKM-2017-1224049
      Ocwen's Case No.: 15766334 & 15802277

Via   Certified Mail No.: 7017 0530 0000 3669 6760
                        7017 0530 0000 3669 6753

Subj.: A Response to Your March 16, 2018
**NOTICE OF SEVERAL ERRORS IN LOAN MODIFICATION, AMOUNT DUE ON ORIGINAL NOTE &
MORTGAGE, ERROR WITHIN THE ASSIGNMENT(S) & TRANSFER(S) OF THE NOTE & MORTGAGE, & A
REQUEST TO DISCLOSE DOCUMENTS, & TO VALIDATE THE DEBT & NOTICE OF DEBT DISPUTE AS TO
THE AMOUNT CLAIM TO BE DUE AND OWING IN LOAN MODIFICATION**

To Phetsamy Khamdaranikorn & Bonnie Filip:
We are in receipt of Ocwen Loan Servicing, LLC's **(OLS's)** letter dated March 16, 2018 responding to our
last letter and are responding as follows:
1-  On or about 2 weeks ago we made an attempt to contact Phetsamy Khamdaranikorn **(PK)**. We
    left a message on **(.PK's)** voicemail asking her to call us back. We wanted to first get a better
    explanation behind **(OLS's)** refusal to cure the obvious errors within the loan modification and to
    ask **(OLS)** for legible copies of at least 15 page within **(PK's)** response on behalf of **(OLS)**. To
    date, **(PK)** has not responded to our call. I am submitting an exact copy of what **(PK)** sent us to
    demonstrate that **(OLS)** has no intention to come to the truth of the matter. See Enclosures "1".
    The 15 blank pages.
2-  **(PK) ,** on behalf of **(OLS)** provided us with 3 copies of the same 15 page blank documents. Those
    ineligible 15 page documents were provided to you, Bonnie Philip **(BF)** and were intended by
    **(OLS)** as proof regarding our payment history, how **(OLS)** have been managing our account, from
    the date that the mortgage was transferred to **(OLS)**. How they have applied the payments, etc.
    The only problem is that those pages cannot be read. And by the way, this is <u>not</u> the first time
    that **(OLS)** have done this. In fact, based on our personal experience with **(OLS)**, we believe that
    it is just one of **(OLS's)** tactics to defraud homeowners.

*Exhibits "7"*

Page 2 of 4

3- As stated in my previous letter and in further support of the facts in this case, on May 29, 1997, Citicorp Mortgage, Inc. **(CMI)** assigned our mortgage to Ocwen Federal Bank, FSB **(OFB, fsb)**. A copy of this 7 page assignment is now attached to this letter as Enclosures "2". We did receive a letter from **(CMI)** informing us of this assignment. However, the letter did <u>not</u> fully disclose the necessary information as prescribed within applicable federal laws. **(CMI)** did not, among other things, inform us of the actual amount in judgment or to be collected by the assignee prior to the transfer of the mortgage.

4- **(CMI)** did not inform us of when **(OFB, fsb)** will begin accepting payments from us as prescribed under applicable federal laws. **(CMI)** failed to inform **(OLS)** the proper amount in arrears. **(CMI)** did not inform us of the effect, if any, that such a transfer may have when it comes to the terms or the continued availability of the life of the mortgage, etc. prior to such a transfer. And more importantly, **(CMI)** prior to its transfer of our mortgage, violated our right by failing to inform us regarding when **(OFB, fsb)** will cease from receiving money from us.

5- Another words, Code 12 of the U.S. Banks and Banking mandates, at the very least, that an assignee must know the amount of its claim prior to assigning it; an assignee must have or must provide a plan to the assignor as to how and for how long it will collect such an amount in arrears, in judgment, or that is due from the borrower in accordance with the original note and mortgage. That was not the case in our present case at a bar. We were not afforded or given that opportunity when such a transfer was made.

6- Public record does show that on or about June of 2005, **(OFB, fsb)** voluntarily liquated its assets. To whom **(OFB, fsb)** sold its assets to is unclear, except that such a liquidation, agreement, acquisition, and/or consideration, etc. might have been covered under certain federal security laws. It is not clear, upon its liquidation, why we weren't informed of this. It is not clear why we did not receive any notice as required by federal laws. If such a transfer between **(OFB, fsb)** and in accordance with applicable federal disclosure laws, please indicate so. Please provide documents showing the details relating to the transfer. Although this particular mandate is optional under federal laws, we would greatly appreciated it if those documents be sent to us.

7- **(USBNA)** must validate the amount it is attempting to collect from us through **(OLS)**, a Debt Collector, in accordance with federal laws and not just in accordance with the NYS Real Property Law Section 417, where 'other duly made or certified document' is sufficient to establish a judgment or a lien against a borrower's property. Under the RESPA law, 15 U.S. Code Section 1692g on Validation of debts, section (b) of said law clearly requires a copy of the judgment as proof to validate any debt. Section (c) also clearly state that,' the failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer. Karnest Joseph and Phenide Joseph signed what **(OLS)** calls a loan modification.

8- With the pending foreclosure action against them, even if they knew that it was **(CMI's)** fault for this foreclosure action by failing to credit their accounts in the sum of $12, 472. 53 dollars that they have paid to **(CMI)**. Such an act could have been deliberately orchestrated by **(CMI)** in an attempt to defraud them. And in an effort to resolve the matter ASAP, executed the document. Such an action did not take away their rights to dispute this debt in question. **(OLS)** is now being placed on official notice that a large portion of this debt is in dispute in accordance with the RESPA law. And a validation in accordance with this law is now required.

9- To further provide proof in support of the facts in this case, as I have stated previously, it is a fact that on or about the 2nd day of February, 1995, the now late Honorable Herbert A. Posner ordered the appointment of a referee. See enclosures "3". A 2 page copy of said Order dated

Page 3 of 4
February 2, 1995. Apparently, a hearing was held without our knowledge. And that amount was sent to us and to Judge Posner to confirm the report.

10- We filed some kind of a reply opposing the referee's report. And on July 11, 1995, Judge Posner denied **(CMI's)** motion and ordered for the referee to give proper notice to us. See enclosures "4". A 2 page order by Judge Posner dated July 11, 1995.

11- And as you know, on April 18, 1996, Stephan J. Siegel, the Referee, after a duly held hearing by both parties and referee, with proof thereof, the referee determined that **(CMI)** was wrong. And that it was trying to defraud us or rob us of as much as $12, 472.53, the same cause for which **(CMI)** initiated its foreclosure action against us to begin with. See the enclosures previously exhibited; but now it is being enclosed as enclosures "5". In addition, and as previously stated, and now with proof thereof, **(CMI)** was not pleased with this decision. We were not pleased either. We and **(CMI)** filed motions to set-aside such a report by the referee.

12- However, Judge Posner adhered to the referee's report and denied both motions. See enclosures "6". A 1 page order dated June 18, 1996 signed by Judge Posner.

13- Now these are the facts. We know of no other order or judgment by Judge Posner or by any other Judge relating to this case at a bar. And if that holds to be true, and if such a judgment is binding by both parties, and if my previous letter which contained an accurate account as to the amount that should have been due from the time that such a judgment was issued to the date that it was assigned to **(OLS)**, then **(OLS)** must correct this error and credit our account accordingly. Its right to enforce any amount that it cannot validate in accordance with applicable federal laws will be rendered null and unenforceable as against us. **(USBNA)** and/or **(OLS)** cannot collect more than what the actual judgment is.

14- Also, in accordance with applicable federal laws, specifically under the National Housing Act, 24CFR 203.616 clearly states, "The mortgagee may modify a mortgage for the purpose of changing the amortization provisions by recasting the total unpaid amount due for a term not exceeding 360 months. The mortgagee must notify HUD of such modification in a format prescribed by HUD within 30 days of the execution of the modification agreement. Title 38 CFR 36.4315, although it applies to guarantee loans, is consistent with such a law where it describes in details that a loan modification should be in effect after the closing date of the original loan or after the maturity of said loan", etc.

15- This is done to allow a borrower to repay what they owe after all payment installments have been made on the original loan. The amount in arrears would then be recast and amortized under the same term and condition as the previous loan or mortgage with a well, calculated and set amount of time to repay the total amount in arrears.

16- The August 1997 Loan Modification does not do that. It does not show the amount that is due or needs to be paid on the original note and mortgage. It does not allow the mortgage to continue with a set amount to be paid after the end of the life of the mortgage or to be paid prior to the end of the life of the mortgage. Not only does such an agreement contains an incorrect sum to be due and owing, it does not specifically mention what **(OLS)** did with the $50, 000.00 dollars deposit; yet the loan modification seeks to extend the life of the mortgage for an additional 8 years without having a set amount to be paid.

17- It is not clear whether **(OLS)**, in accordance with said law, "notified HUD of such a modification agreement. We are not sure if **(OLS)** provided the right information to HUD to the extent that such a loan modification was approved. It is not clear whether the Office of Thrift Services **(OTS)**, who currently regulates **(OLS)**, in accordance with certain applicable federal laws, approved such a loan modification or was/is aware of such a loan modification. It is not clear whether **(OLS)** provided the proper and/or accurate information to **(OTS)** in order to obtain an approval from **(OTS)** regarding

Page 4 of 4

this loan modification. We will need any and all document(s) that had been sent, executed, to any agency or agencies in connection with the approval of this loan modification.

**In conclusion:** The following information is required from **(USBNA)** and/or from **(OLS)**:

a- A judgment validating the amount stated within the August 1997-Loan Modification, together with a statement from its directors of reason(s) for relying upon the amount as set forth within the August 1007-Agreement. (We require total disclosure in this matter.)

b- A legible copy of the payment history that have been previously sent on March 16, 2018. Please provide a legible copy of those 15 page payment history.

c- A copy of any (documents) disclosures sent by **(OLS)** or by **(USBNA)** or vice-versa prior to the acceptance of this assignment by **(OLS).**

d- A copy of any (documents) disclosures as between **(CMI)** and **(OFB, fsb)** concerning the terms, conditions, consideration of **(OFB, fsb's)** acceptance of said assignment.

e- A copy of any (documents) disclosures between **(OLS)** and **(OFB, fsb)** in connection to **(OLS's)** appointment as a debt collector. Provide proof of appointment by **(OFB, fsb)** and/or by **(USBNA)**, as an assignee and or as a debt collector.

f- A copy of or proof of any payment received by HUD in connection with this transfer, sale, assignment, etc.

g- A copy of **(OFB, fsb's)** actual application, together with its contents and attachments which led to the approval of the August 1997 loan modification by HUD or by OTS, including the final disposition or order by either agency confirming such an approval.

h- A copy of **(OLS's)** actual application, together with its contents and attachments which led to the approval by HUD or by OTS in the servicing of and/or in the debt collection of our loan.

i- A detail account as to what **(OFB, fsb)** presented to **(USBNA)** as its liability, and/or future profit when it presented its books, records, etc. to **(USBNA)** in connection with said property in question.

Should you have any question regarding these demands, please feel free to call me at 347-551-9786. Should you wish to contact me via email or wish to send these documents via email, my email address is goodtone450@aol.com. Thank you for your cooperation in this matter.

Sincerely yours,

Mr. George Joseph
cc: Phetsamy Khamdaranikorn, at
    Ocwen Loan Servicing, LLC
    1661 Worthington Road, Ste. 100
    West Palm Beach, Florida, 33409
    Certified Mail No.: 7017 0530 0000 3669 6753

cc: To Bonnie Philip, at the New York State
    Department of Financial Services
    Mortgage Assistance Unit, Bonnie
    Philip, One State Street Plaza
    New York, NY 10004
    Certified Mail No.: 7017 0530 0000 3669 6760

THE 15-BLANK PAGES

ENCLOSURES "1"

















THE 7-PAGE ASSIGNMENT OF MORTGAGE

ENCLOSURES "2"

REEL 4656 PG 1719

### Assignment of Note and Mortgage

This instrument prepared by:

Citicorp Mortgage, Inc.
c/o Ocwen Federal Bank FSB
1665 Palm Beach Lakes Blvd.
West Palm Beach, FL 33401
Prepared by: Ed Alonzo

Name: _____

Upon recordation, return to:

Court Explorers, Inc.
300 Rector Place
New York, NY 10280
Attn: Tim Collins  (Citi97)

## ASSIGNMENT OF MORTGAGE/DEED TO SECURE DEBT/
## BENEFICIAL INTEREST UNDER DEED OF TRUST

=====================================

(hereinafter this "**Assignment**")

In consideration of the sum of $10 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned a corporation duly organized and existing under the laws of the State of Delaware with offices at 15851 Clayton Road West, Ballwin, MO 63188, as Attorney In Fact for Citibank, N.A., a national banking association ("**Assignor**"), does hereby grant, bargain, sell, convey, assign, transfer, and set over unto ███████ _____, a _____

███████ of _____, with offices at _____, ("**Assignee**"), all of Assignor's right, title and interest, of any kind whatsoever, including, without limitation, that of mortgagee, beneficiary or lender (as the case may be) in and to the mortgage/deed of trust/deed to secure debt (as the case may be) described on Schedule 1 attached hereto (the "**Mortgage**"), the bond(s), note(s) and/or obligation(s) secured thereby, the moneys due and to grow due thereon with interest as specified therein, all rights accrued or to accrue under said mortgage, and in any and all other related security instruments.

0000676230

2855070

OCWEN FEDERAL BANK FSB
1665 Palm Beach Lakes Blvd., #105
West Palm Beach, FL 33401

REEL 4656 PG 1720

In the event the Mortgage encumbers premises in the State of New York, and in compliance with Section 275 of the New York Tax Law, the Assignor hereby certifies that the Assignee is not a nominee of the Mortgagor (or of a successor-in-interest to the Mortgagor) and that the Mortgage continues to secure a bona-fide indebtedness and/or obligation.

**IN WITNESS WHEREOF**, the undersigned by its duly elected officers (who for purposes of real property, if any, located in the District of Columbia, are hereby appointed as its attorneys-in-fact) and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this Assignment.

**DATE:** 5-29-97

ASSIGNOR: Citicorp Mortgage, Inc.
as Attorney In Fact for Citibank, N.A., a
national banking association

By: _Charles H. Stern_
Charles H. Stern
Assistant Vice President

As to Georgia and Louisiana Properties Only:

Notary Public

*Power of Attorney Recorded*
*Date 7-20-88*
*Book 2641 Page 2032*

0009676230
265070

REEL 4656 PG 1721

## MULTI-STATE CORPORATE ACKNOWLEDGMENT
### (For use in all states except GA & LA)

STATE OF MISSOURI      )
                                ) ss.:
COUNTY OF ST. LOUIS    )

On this 29th day of MAY, 1997, before me, the undersigned officer, personally appeared Charles H. Stern, personally known and acknowledged himself to me (or proved to me on the basis of satisfactory evidence) to be the Assistant Vice President of Citicorp Mortgage, Inc. and that as such an officer, being duly authorized to do so pursuant to its bylaws or a resolution of its board of directors, executed, subscribed and acknowledged the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself in his authorized capacity as such an officer as his free and voluntary act and deed and the free and voluntary act and deed of said corporation.

**IN WITNESS WHEREOF,** I hereunto set my hand and official seal.

_Robyn Hackworth_
Notary Public

**NOTARIAL SEAL**

My Commission Expires:

_____

```
ROBYN HACKWORTH
NOTARY PUBLIC — NOTARY SEAL
STATE OF MISSOURI
ST. LOUIS COUNTY
MY COMMISSION EXP. MAY 24,1998
```

000967623D
2855670

REEL 4656 PG 1722

## Schedule 1

### Description of Mortgages

Mortgage/Deed of Trust/Deed to Secure Debt

Mortgagor/Trustor: <u>KARNEST JOSEPH & PHENIDE JOSEPH</u>

Trustee (if any): _____

Mortgagee/Beneficiary/Lender: <u>Citibank, N.A.</u>

Dated: <u>October 12, 1989</u>

Recorded: <u>October 26, 1989</u>

Book/Volume/Reel: <u>2895</u>  Page/Folio: <u>654</u>

Document/Instrument No.: <u>CG18780</u>

Registry Cert. No.: _____

Encumbering premises described therein located in the

County of <u>Queens</u>

State of <u>NY</u>

[x] Tax Lot Designation [check if applicable]
[x] More particularly described on Exhibit A hereto [check if attached].

0009676230
2855670

REEL 4656 PG 1723

## Exhibit A

Tax Parcel ID/Pin No. Designation: Queens (County), NY
                    Section: 49  Lot : 83  Block : 11267

Property Address for the Premises: 114-74 224TH STREET
                                CAMBRIA HEIGHTS, NY

0000676230
2855070

REEL 4656 PG 1724

## ORIGINAL PRINCIPAL AMOUNT OF MORTGAGE RECITAL

The original Principal amount of the Mortgage is  $132,000.00

0009476230

2855070

JUDGE POSNER'S ORDER APPOINTING A REFEREE

DATED 2/2/1995

ENCLOSURES "3"

24433/1993 DOCUMENTED: ORDERED 03-8 TO 10/21/2017

Page 63 of 1145

At an IAS Part 5 of the
Supreme Court of the State of
New York held in and for the
County of Queens, Supreme
Court House, 88-11 Sutphin
Boulevard, Jamaica, New York
on the *2/21* day of February,
1995.

PRESENT

HON. HERBERT A. POSNER

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

--------------------------------------

CITIBANK, N.A.,

                        Plaintiff,

        - against -

KARNEST JOSEPH, PHENIDE JOSEPH A/K/A
PHENIDE P. JOSEPH, RAMINO OLIVIER,
55-11 SALES ENTERPRISES INC., and NEW
YORK CITY PARKING VIOLATIONS BUREAU,
and "JOHN DOE #1" through "JOHN DOE
#10," the last ten names being
fictitious and unknown to plaintiffs,
the persons or parties intended being
the tenants, occupants persons or
corporations, if any, having or
claiming an interest in or lien upon
the premises described in the verified
complaint,

                        Defendants.

--------------------------------------

Index No.
024433/93

ORDER GRANTING
SUMMARY JUDGMENT,
APPOINTING REFEREE
TO COMPUTE,
AMENDING CAPTION

        Plaintiff, Citibank, N.A., having *cross-* ~~duly~~ moved for an Order:

(a) granting summary judgment in favor of plaintiff and against

defendants Karnest Joseph and Phenide Joseph; (b) pursuant to

RPAPL 1321 appointing a referee to compute the amount due

plaintiff and to determine whether the premises should be sold in

one parcel; (c) amending the caption to name as a party defendant

"John" Joseph as John-Doe # 1 and deleting from the caption,

without prejudice, defendants "John Doe #2 through John Doe #10;"

40239.1

~~s due to any of the defendants whose interest are senior to lien of the said mortgage, and to examine and report whether the premises encumbered by the said mortgage may be sold in one parcel and, if the whole amount of the mortgage has not as of yet become due, to report the amount to already have become due, and to report to this Court with all convenient speed, and it is further

ORDERED, that caption is amended to name as a party defendant "John" Joseph as John Doe #1 and deleting from the caption, without prejudice, defendants "John Doe #2" through "John Doe #10" and discontinuing the action against "John Doe #2" through "John Doe #10", all of the foregoing without prejudice to any of the proceedings heretofore had or to be had in this action.

ENTER

DM _____ J.S.C.

40239.1                                    4

JUDGE POSNER'S ORDER DENYING THE REFEREE'S REPORT

DATED 7/11/1995

ENCLOSURES "4"

Short Form Order

NEW YORK SUPREME COURT - QUEENS COUNTY

Present:  Honorable  HERBERT A. POSNER    IA PART 5
                                Justice

```
------------------------------------x
CITIBANK, N.A.                      :      Index
                                    :      Number __24433__ 1993
                                    :
                                    :      Motion
              - against -           :      Date   _July 11_ 1995
                                    :
                                    :      Motion
KARNEST JOSEPH, et al.              :      Cal. Number _17_
------------------------------------x
```

The following papers numbered 1 to _6_ read on this motion by
plaintiff for judgment of foreclosure and sale, to confirm the
computation report of the Referee and for attorney's fees and
cross motion by defendants Karnest and Phenide Joseph, appearing
pro se, to reargue a prior motion and to disaffirm the Referee's
report.

|                                                        | Papers Numbered |
|--------------------------------------------------------|-----------------|
| Notice of Motion - Affidavits - Exhibits............. | 1 - 3 |
| Notice of Cross Motion - Answering Affidavits - Exhs. | 4 - 5 |
| Replying Affidavits .................................. | 6 |

     Upon the foregoing papers it is ordered that the motion and
cross motion are disposed of as follows:

     All parties appearing in the action are entitled to notice
of the hearing before the Referee appointed to compute the amount
due on the note and mortgage.  (15 Carmody-Wait 2d, Mortgage
Foreclosure, § 92:198; see, Shultis v Woodstock Land Dev.
Assocs., 195 AD2d 677; Bowery Sav. Bank v 130 East 72nd St. Rlty.
Corp., 180 AD2d 559.)  Defendants Karnest and Phenide Joseph deny
receipt of any notice of hearing and the Referee's report fails
to state that such notice was given or attach proof of service on

defendants.  Under these circumstances a new report must be submitted, on proper notice, so that the Referee may consider whatever additional evidence defendants may submit.

Plaintiff's motion is, therefore, denied without prejudice to renewal after the submission of a new report by the Referee. The cross motion by defendants Karnest and Phenide Joseph is granted solely to the extent of directing the Referee to submit a new report on proper notice and is, in all other respects, denied.  Plaintiff is directed to serve a copy of this order on the Referee.

HON. HERBERT A. POSNER

Dated: September 5, 1995

. . . . . . . . . . . . . . . . . . . . . . .

J.S.C.

2

THE REFEREE'S REPORT

DATED 4/18/1996

ENCLOSURES "5"

NEW YORK SUPREME COURT
COUNTY OF QUEENS: I.A.S. PART 5
-------------------------------------------------------x
CITIBANK, N.A.,                                    **REPORT OF**
                                                   **COMPUTATION**
                          Plaintiff,

          -against-

KARNEST JOSEPH, ET AL.,                            Index No. 24433/93

                          Defendants.
-------------------------------------------------------x

By an order of the Court dated December 27, 1995, this matter was set down for a hearing to compute. Appearing on behalf of the plaintiff was CERTILMAN, BALIN, ADLER & HYMAN, LLP, by MICHAEL MANNIELLO and RENE CEUSTERS, an officer of the plaintiff CITIBANK.

Appearing on behalf of the defendants was their son, GEORGE JOSEPH, who swore pursuant to the penalties of perjury that he was authorized to represent his parents.

The plaintiffs initially claimed their right to judgment in the amount of $177,716.08.

The defendants claimed numerous credits and additionally that the defendants contested the amount due and claimed that they were overcharged and in fact owed $162,696.31. At the hearing and in memoranda submitted thereafter, exhibits were introduced by the defendant showing that they were entitled to a credit of $12,472.53 by virtue of payments that had been received by the plaintiff but not credited to their account. The plaintiff alleged that these payments were not made and that defendants were not entitled to the credit. Plaintiffs failed to produce any evidence to rebut this

presumption. Accordingly, the defendant ⬤ e entitled to that credit. It must be deducted from the amount due the plaintiff.

After hearing testimony and examining the evidence submitted by both sides, I compute the sum of $165,243.55 due, computed as follows:

| | |
|---|---|
| Principal | $ 129,687.75 |
| Interest (4/1/93 to 1/31/96 - at 11.25%) | 40,951.13 |
| Late charges | 978.72 |
| Escrow taxes | 5,772.63 |
| Appraisal | 75.00 |
| Inspection | 250.85 |
| | $ 177,716.08 |
| Less: Payments not credited | (12,472.53) |
| Amount due: | $ 165,243.55 |

Dated: Forest Hills, New York

April 18, 1996

STEPHAN J. SIEGEL, Referee
109-01 72nd Road - Suite 1A
Forest Hills, New York  11375
(718) 575-3900

JUDGE POSNER'S ORDER ADHERING

TO THE REFEREE'S REPORT

DATED 7/3/1996

ENCLOSURE "6"

# M E M O R A N D U M

SUPREME COURT - QUEENS COUNTY
I.A.S. PART 5

---

CITIBANK N.A.,
      Plaintiff,

  -against-

KARNEST JOSEPH, et al.,
      Defendants.

---

Index No. 24433/93

By: POSNER, J.

Date: July 3, 1996

Motion Date:
    June 18, 1996

      Plaintiff and defendants Joseph in this foreclosure action move to reject or modify the Referee's Report of Computation dated April 18, 1996 which was rendered after a hearing.

      The motion and cross motion are denied and the Court hereby confirms the Referee's Report dated April 18, 1996.  The plaintiff is directed to enter a judgment based upon the aforesaid Referee's Report and to include in the judgment a fee for $1,000.00 to be paid to the Referee in addition to the statutory fee of $200.00.

      Settle judgment of foreclosure and sale.

                   J.S.C.

# EXHIBITS "8"

Defendant'(s)' Response Letter Dated June 13, 2018



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ®

PO Box 785061
Orlando FL 32878-5061
Toll Free: (800) 390-4656

June 13, 2018

Account Number: 2855070
Ocwen's Case Number: 17964743

George Joseph
3 Sunset Drive
Bellport NY 11713

| | |
|---|---|
| Customer(s): | Karnest Joseph |
| | Phenide Joseph |
| | Ramino Olivier |
| Property Address: | 114-74 224th Street |
| | Cambria Heights NY 11411-1226 |

Dear George Joseph:

Thank you for contacting the Office of the Consumer Ombudsman. This letter is in response to your recent communications on behalf of Karnest Joseph, Phenide Joseph, and Ramino Olivier. We appreciate the information provided and welcome the opportunity to review the concerns raised. I have been assigned to thoroughly review these concerns and my findings are outlined below.

Based on the information provided, you advised the payment history previously received was blank, you expressed concern with the notice of servicing transfers letters and the August 1997 loan modification. You also requested validation of this debt.

As you expressed concerns with being able to read the payment history previously provided, we have enclosed a copy of the payment history in a different format that we hope is easier for you to read. We however apologize if the payment history previously provided was not legible.

Unfortunately, since the transfer to Ocwen occurred in 1997, we do not have copies of the notice of servicing transfer. Due to this, we are unable to advise what information may or may not have been provided in said notices. The remaining documents you requested are not provided as they are proprietary and confidential or do not pertain to the servicing of the account. Additionally, we are unable to respond to concerns regarding occurrences prior to our acquisition of servicing of the account in 1997.

In response to your concerns with the August 1997 loan modification, it is important to note that your account is not insured by the United States Department of Housing and Urban Development; therefore, we are not required to provide you details mandated by the National Housing Act 24CFR203.616. As provided in our January 19, 2018 response, the original lender was Citibank, N.A. We are unable to respond to concerns regarding loan origination, as we were not party to the origination of this account. There is no single owner of the account, but rather the account is one of many in a securitized investment trust, Mortgage Pass-Through Certificates 1998-R2. We are servicing the account for this trust. U.S. Bank, National Association is the Trustee. However, as previously indicated, they do not own the account. Their mailing address is 60 Livingston Ave EM-MN-WS3D, St. Paul, MN 55107 and their telephone number is (800) 934-6802.

We are unable to provide you with a judgment validating the amount stated within the August 1997 loan modification; however, we can advise you that with the loan modification, $2,582.42 was capitalized or added to the principal balance. This amount consisted of $2,487.17 to bring the escrow account balance positive and $95.25 in fees:

With the loan modification, the principal balance increased from $127,105.58 to $129,688.00. By signing the Modification Agreement, you agreed to the modified principal balance and the terms contained in the agreement.

NMLS # 1852

NC Permit # 3946

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in an active bankruptcy case or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

*Exhibits "8"*



**Ocwen Loan Servicing, LLC**
WWW.OCWEN.COM
*Helping Homeowners is What We Do!* ®

PO Box 785061
Orlando FL  32878-5061
Toll Free: (800) 390-4656

In response to your concerns with reaching a representative of this office, we confirmed that Ms. Phetsany Khamdaranikorn was experiencing difficulties retrieving her voicemail and will be contacting you shortly.  We apologize she was unable to return your voicemail at an earlier date and for any perceived delay in response.

Lastly, in response to your request for a copy of the application which led to the approval of the August 1997 loan modification, we do not have copies of any applications submitted in 1997 and regrettably are unable to provide you with said copy.

As of the date of this letter, the account is due for the June 1, 2018 payment and the unpaid principal balance is $78,727.57.

Thank you for bringing your concerns to our attention.  We have reviewed your concerns regarding the payment history and 1997 loan modification and while we found no error, we have provided the payment history in a different format. I have enclosed the documentation we relied upon to review your concern.  If you believe there is additional documentation relevant to your issue, which was not provided, you may request such documents by contacting me at the address below or at the Ombudsman Office via fax (866) 771-5152.

U B Rajesh, Office of the Consumer Ombudsman
P O Box 785061
Orlando FL  32878-5061

Thank you for allowing us to assist you.  Ocwen's mission is to help homeowners and we hope this response addressed your concerns regarding the account.  If you have further questions regarding this response, please contact me at (800) 390-4656, Monday through Friday from 8:30 am to 5:30 pm ET.

You may also contact Ocwen's Customer Care Center at (800) 746-2936 for additional information regarding the account. We are available Monday through Friday 8:00 am to 9:00 pm and Saturday 8:00 am to 5:00 pm ET.  You may also find helpful information on our website: www.ocwen.com.

Sincerely,

U B Rajesh
Consumer Account Analyst
Office of the Consumer Ombudsman

Enclosure

cc:    Karnest Joseph
       3 Sunset Dr
       Bellport NY  11713

       Phenide Joseph
       Ramino Olivier
       114-74 224th St
       Cambria Heights NY  11411-1226

NMLS # 1852                                                                                          NC Permit # 3946
*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in an active bankruptcy case or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

# EXHIBIT   "9"

Defendant'(s)' March 21, 2018-Letter



**Ocwen Loan Servicing**
WWW.OCWEN.COM
*Helping Homeowners Is What We do!* ™

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: (800) 746 – 2936

03/21/2018

Loan Number: 2855070

George Joseph
Email: goodtone450@aol.com

**Property Address:**
114-74 224th Street
Cambria Heights, NY 11411-1226

Dear George Joseph,

Ocwen Loan Servicing, LLC (OCWEN) would like to take this opportunity to thank you for your recent communication regarding the above referenced loan. We appreciate the time and effort on your part to bring your concern to our attention. Pursuant to your request, we have reviewed the loan and below is our response to the inquiry raised:

**Inquiry:** You requested Ocwen to provide you with the investor information of the loan.

**Response:** The owner of the mortgage may consists of multiple investors through a mortgage backed securities trust. The owner of this loan is U.S. Bank, National Association as Trustee for Mortgage Pass-Through Certificates 1998-R2. Their phone number is 1-800-934-6802 and their mailing address is 60 Livingston Ave EM-MN-WS3D, St. Paul, MN 55107. This information is based upon our review of your loan at this time. With many mortgages, the ownership status may change from time to time; however, Ocwen is currently servicing the account and all inquiries should be directed to our office.

For any further information, you may contact our Customer Care Center at 1-800-746-2936 (Monday through Friday 8:00 am to 9:00 pm ET, Saturday 8:00 am to 5:00 pm ET).

We trust that the information provided has fully addressed your concern. Please note that you may request copies of collateral or certain loan documents that were relied upon in making this determination. You may receive these documents by sending in a written request to the Research Department at the address mentioned below. Please visit our website (www.ocwencustomers.com) which is available 24 hours a day, seven days a week, as many of the answers to your account specific questions may be found there. However, should you have any further questions in regards to this issue, please contact our Research Department at (800) 241-9960. After speaking with our Research Department, if you still have questions or concerns, please feel free to contact the OCWEN consumer advocate through OCWEN's website or by phone at (800) 390-4656. You may also send written correspondence to the following address:

Ocwen Loan Servicing, LLC
Attention: Research Department
P.O. BOX 24736
West Palm Beach, FL 33416-4736
Fax Number: (407) 737-6375

Sincerely,

Research Department
Ocwen Loan Servicing, LLC

RPFS_Letter

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.

*Exhibit 9 )l*

NMLS # 1852